# EXHIBIT J

# ORIGINAL

1

2   UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - x
SUSAN McCARTHY,

4

                          Plaintiff,

5          - against -

6   ROOSEVELT UNION FREE SCHOOL DISTRICT;
DEBORAH L. WORTHAM, individually and

7   in her Official Capacity; CLYDE
BRASWELL, individually and in his

8   Official Capacity; EDITH HIGGINS,
individually and in her Official

9   Capacity; Roosevelt Union Free School
District employees "JOHN DOE" 1-10 (the

10  name "John Doe" be fictitious, as the
true names are presently unknown);

11  COUNTY OF NASSAU; NASSAU COUNTY POLICE
DEPARTMENT; POLICE OFFICER JOSEPH STASSI,

12  individually and in his Official
Capacity; POLICE OFFICER MONIQUE AMODEO,

13  individually and in her Official
Capacity; MEDIC MATTHEW FIELD,

14  individually and in his Official
Capacity; Nassau County employees

15  "JOHN DOE" 11-20 (the name "John Doe"
being fictitious, as the true names are

16  presently unknown),

17                          Defendants.

    - - - - - - - - - - - - - - - - - - - x

18

                          240 Denton Place
19                        Roosevelt, New York
20                        May 12, 2016
                          2:11 P.M.

21

22

23  WITNESS:   MONIQUE AMODEO

24

25

Page 2

1

2

3

4

5          DEPOSITION of MONIQUE AMODEO, one of the

6     Defendants herein, taken by the Plaintiff and

7     Co-Defendants herein, pursuant to The Federal Rules

8     Of Civil Procedure, held at the above-mentioned time

9     and place, before Raymond Stalker, RPR, a Notary

10    Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1
 2    A P P E A R A N C E S :
 3    WOLIN & WOLIN, P.C.
      Attorneys for Plaintiff
 4         420 Jericho Turnpike
           Jericho, New York 11753
 5
      BY:  ALAN E. WOLIN, ESQ.
 6
 7    SILVERMAN & ASSOCIATES
      Attorneys for Defendants
 8    Roosevelt Union Free School District,
      Deborah L. Wortham, Clyde Braswell,
 9    Edith Higgins,
           445 Hamilton Avenue
10         White Plains, New York 10601
11    BY:  GERALD S. SMITH, ESQ.
12
      NASSAU COUNTY ATTORNEY'S OFFICE
13    Attorneys for Defendants County of Nassau,
      Nassau County Police Department, Police
14    Officer Joseph Stassi, Police Officer Monique
      Amodeo, Medic Matthew Field
15         One West Street,
           Mineola, New York 11501
16
      BY:  LIORA BEN-SOREK, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 4

1

2

3

4

5          IT IS HEREBY stipulated and agreed by and

6     among counsel for the respective parties hereto,

7     that the sealing and certification of the within

8     deposition shall be and the same hereby waived.

9          IT IS FURTHER STIPULATED AND AGREED that all

10    objections, except to the form of the question,

11    shall be reserved to the time of trial;

12         IT IS FURTHER STIPULATED AND AGREED that the

13    within deposition may be signed before any Notary

14    Public with the same force and effect as if signed

15    and sworn to before the court.

16

17

18

19

20

21

22

23

24

25

1                    MONIQUE AMODEO

2     M O N I Q U E    A M O D E O, one of the Defendant-s

3     herein, having first been duly sworn by a Notary

4     Public of the State of New York, was examined and

5     testified as follows:

6                    MR. WOLIN:  Good afternoon,

7              Officer.  My name is Alan Wolin.  I'm

8              an attorney.  I represent Susan

9              McCarthy in this lawsuit.  I'm going

10             to be asking you a few questions

11             concerning the facts and

12             circumstances of the lawsuit.  If at

13             any time I ask you a question which

14             you do not understand, ask me to

15             rephrase and I will attempt to do the

16             best I can.

17    EXAMINATION BY

18    MR. WOLIN:

19         Q.    Please state your full name for

20    the record.

21         A.    Police Officer Monique Amodeo.

22         Q.    What is your present business

23    address?

24         A.    Police Headquarters, 1490

25    Franklin Avenue, Mineola, New York 11501.

1                    MONIQUE AMODEO

2       Q.      What, if anything, did you do to

3   prepare for this deposition today?

4       A.      What did I do?

5       Q.      If anything, to prepare for this

6   deposition?

7       A.      I didn't do anything.

8       Q.      Did you speak to the county

9   attorney to prepare?

10      A.      Yes.  I thought you meant today.

11      Q.      When did you speak to the county

12  attorney concerning this deposition?

13      A.      I don't know the date.

14      Q.      Did you review any documents to

15  prepare for this deposition?

16      A.      I did not.

17              MS. BEN-SOREK:  Today or in the

18          past?

19              MR. WOLIN:  At any time?

20      Q.      I didn't restrict the question to

21  today.  Have you reviewed any documents at

22  any time to prepare for this deposition?

23      A.      Yes.

24      Q.      What did you review?

25      A.      My letter.

Page 7

1                          MONIQUE AMODEO
2          Q.      Anything else?
3          A.      Just my letter.
4          Q.      When you say your letter, what
5     are you referring to?
6          A.      My letter to -- I don't know if
7     it was the district attorney's office or to
8     my commanding officer.
9          Q.      Was that letter that she gave to
10    the County Attorney's Office that you have
11    withheld from production on the grounds of
12    attorney-client privilege?
13              MS. BEN-SOREK:   Right.   That's
14         part of the Notice of the Claim
15         investigation report.
16         Q.      When did you furnish that letter,
17    as you call it, to the county attorney?
18         A.      I don't have any dates, any
19    recall of any dates.   I don't have it.
20              MS. BEN-SOREK:   By counsel, I
21         will just clarify that.   I believe it
22         goes to the police department legal
23         bureau and then it's forwarded to us.
24              MR. WOLIN:   I understand.
25         Q.      Did you review any the other

Page 8

1                    MONIQUE AMODEO

2    documents, besides that letter, to prepare

3    for this deposition?

4         A.    No.

5         Q.    Did you speak to anyone, other

6    than counsel, to prepare for this deposition?

7         A.    No.

8         Q.    Are you familiar with a Police

9    Officer Stassi?

10        A.    I am.

11        Q.    Did you speak to Police Officer

12   Stassi to prepare for this deposition?

13        A.    No.

14        Q.    Have you ever spoken to Police

15   Officer Stassi about the facts and

16   circumstances of this lawsuit?

17        A.    While he was my partner.

18        Q.    When was he your partner?

19        A.    He was my partner for eight and a

20   half years.

21        Q.    Did a come when he stopped being

22   your partner?

23        A.    Yes.

24        Q.    When did he stop being your

25   partner?

1                    MONIQUE AMODEO

2        A.      I don't have the exact date.  It

3    was a year and a half ago, perhaps.

4        Q.      How many times did you speak to

5    Officer Stassi about the allegations in this

6    lawsuit?

7        A.      How many times?

8        Q.      Yes.

9        A.      I think when we had to write our

10   letter maybe.  No, he was already gone at

11   that point.  Just that day.

12       Q.      The day that it occurred?

13       A.      Yes.  I believe he was gone when

14   they requested a letter.

15       Q.      Subsequent to the date that this

16   incident occurred, which I think we will

17   ascertain was May 28th, 2014, have you spoken

18   to Officer Stassi about the facts and

19   circumstances of what had happened?

20       A.      Say that again.

21       Q.      Did you speak to Officer Stassi

22   after May 28th, 2014, about the facts or

23   circumstances of this case?

24       A.      After that date, no.

25       Q.      Did you communicate with Officer

1                          MONIQUE AMODEO

2       Stassi in any form whatever, including

3       E-mails, concerning the facts and

4       circumstances of this case, after May 28th,

5       2014?

6            A.      No.

7            Q.      When was the last time you spoke

8       to Officer Stassi?

9            A.      The day he left SRO, eighteen

10      months ago.

11           Q.      And you said it was approximately

12      a year and a half ago.

13           A.      Approximately.

14           Q.      Besides counsel, have you ever

15      spoken to anyone else about the facts and

16      circumstances of this lawsuit, after May

17      28th, 2014?

18           A.      My supervisor.

19           Q.      And what is the name of your

20      supervisor?

21           A.      Sergeant O'Mara.

22           Q.      How many times did you speak to

23      the sergeant about the facts and

24      circumstances of this case?

25           A.      I believe once when I handed in

Page 11

MONIQUE AMODEO

2  my letter.

3      Q.     Was that the letter that you
4  referred to previously?

5      A.     It is.

6      Q.     At the time you handed him the
7  letter, what, if anything, did you say to him
8  about the facts and circumstances of why you
9  were writing the letter?

10     A.     We reviewed the letter.

11     Q.     So you made the letter and you
12  gave it to the sergeant; is that correct?

13     A.     Correct.

14     Q.     And do you know what the Sergeant
15  did it?

16     A.     I believe he had to write a
17  letter as well.

18     Q.     Why did he have to write a
19  letter; do you know?

20     A.     I have no idea how this process
21  works.

22     Q.     Do you know what the sergeant did
23  the letter you gave him?

24     A.     I have no idea what he did with
25  my letter or his letter.

Page 12

1          MONIQUE AMODEO

2              MR. WOLIN:  Well, I call for the

3          production of that letter.  If she

4          gave it to the sergeant, then it

5          seems to me that would break the

6          attorney-client privilege.

7              MS. BEN-SOREK:  We'll take the

8          request under advisement and please

9          put them in writing.

10             MR. WOLIN:  I'm sorry?

11             MS. BEN-SOREK:  And I ask that

12         you follow it up in writing.

13     Q.      Is that the only time that you

14 interacted with the sergeant concerning the

15 facts and circumstances of this case?

16     A.      Yes.

17     Q.      Have you spoken to anyone else

18 concerning the facts and circumstances of

19 this case, after May 28th, 2014?

20     A.      I don't think so.

21     Q.      Have you communicated with

22 anyone, other than what you have testified

23 to, about the facts and circumstances of this

24 case, after May 28th, 2014?

25     A.      I don't think so.

Page 13

1                    MONIQUE AMODEO

2        Q.        Have you sent any E-mails to

3    anyone concerning the facts and circumstances

4    of this case, after May 28th, 2014?

5                    MS. BEN-SOREK:  Objection, but

6            you can answer.

7                    THE WITNESS:  I'm sorry?

8                    MS. BEN-SOREK:  Objection, but

9            you can answer.

10       A.        I don't think so.

11       Q.        By whom are you currently

12   employed?

13       A.        Nassau County Police Department.

14       Q.        How long have you been employed

15   by the Nassau County Police Department?

16       A.        I'm in my 23rd year.

17       Q.        And what is your current command?

18       A.        The First Precinct.

19       Q.        How long have you been assigned

20   to the first precinct?

21       A.        Since I graduated the academy, 22

22   years.

23       Q.        So basically the entire time?

24       A.        Yes.

25       Q.        And in May 2014, did you have a

Page 14

1                    MONIQUE AMODEO

2    particular are assignment within the First

3    Precinct?

4         A.    We're assigned as school resource

5    officers to the Roosevelt School District.

6         Q.    What is a school resource

7    Officer?

8         A.    A liaison between the police

9    department and the school district.

10        Q.    Was that a full-time assignment?

11        A.    Yes.

12        Q.    Did you do any other police work

13   in May of 2014, not concerning the Roosevelt

14   School District?

15        A.    That's my assignment.  Do I take

16   police action outside of the school?  Yes, I

17   do.

18        Q.    But when you say that's your

19   assignment, is that where you spend the

20   working day?

21        A.    That's where I am assigned, to

22   the district.

23        Q.    Are you assigned to any patrol

24   car?

25        A.    Yes.

1                  MONIQUE AMODEO

2       Q.      And in May of 2014, what patrol

3   car were you assigned to?

4       A.      I don't know if we had gotten a

5   new car by then, but it's RMP 139, I believe

6   that's what we were.

7       Q.      139?

8       A.      I don't know if we had a new car

9   at that point.

10      Q.      In May of 2014, as an SRO, did

11  you have a particular sector in which you

12  patrolled?

13      A.      The Roosevelt School District.

14      Q.      So as a police officer you do

15  patrol work; is that correct?

16      A.      Yes.

17      Q.      And during the normal course of

18  the day is it your testimony that your patrol

19  work consisted of going back and forth to

20  school facilities?

21      A.      That is our assignment.

22      Q.      Now, in May of 2014, were there

23  any other SROs that served the Roosevelt

24  School District?

25      A.      No.

1                    MONIQUE AMODEO

2        Q.      When mentioned Officer Stassi,

3   you indicated that he was your partner?

4        A.      Yes.

5        Q.      Was he your partner in May of

6   2014?

7        A.      Yes.

8        Q.      Was he an SRO?

9        A.      Yes.

10       Q.      So he was an SRO in May of 2014?

11       A.      Yes.

12       Q.      And was he an SRO with reference

13  to the Roosevelt School District?

14       A.      Yes.  He was my partner.

15       Q.      So you and he in May of 2014 were

16  both SROs whose area of responsibility was

17  the Roosevelt Union Free School District; is

18  that correct?

19       A.      That's correct.

20       Q.      In May of 2014, were there any

21  other police officers who were assigned as s

22  SROs at the Roosevelt School District?

23       A.      No.

24       Q.      As an SRO assigned to the

25  Roosevelt Union Free School District in May

1           MONIQUE AMODEO

2    of 2014, what were your duties and

3    responsibilities?

4         A.    We handled all assignments for

5    the school district.

6         Q.    As an SRO, was it one of your

7    responsibilities to report to calls that you

8    received?

9         A.    Yes.

10        Q.    And can you describe during the

11   normal tour what you actually did in May of

12   2014?

13              MS. BEN-SOREK:  Objection.  You

14         can answer.

15        A.    No, I can't.

16        Q.    What's your shield number?

17        A.    913.

18        Q.    And in May of 2014, I assume that

19   your immediate supervisor had the rank of

20   sergeant; is that correct?

21        A.    Yes.

22        Q.    On May 28th, 2014, what tour did

23   you work that day?

24        A.    0700 to 1700.

25        Q.    Are you still an SRO in the

Page 18

1                    MONIQUE AMODEO

2    Roosevelt School District today?

3         A.    Yes.

4         Q.    Have you served as an SRO in the

5    Roosevelt Union Free School District

6    continuously since May of 2014?

7         A.    Yes.

8         Q.    When did you first start serving

9    as an SRO in the Roosevelt Union Free School

10   District?

11        A.    I don't have that date.

12        Q.    Can you approximate?

13        A.    Five or six years.

14        Q.    Five or six years prior to 2014

15   or prior to today?

16        A.    Prior to today.

17        Q.    So is it fair to say that in May

18   of 2014 you had been serving as an SRO in the

19   Roosevelt Union Free School District for

20   approximately three, four years?

21        A.    I would say that's a good

22   approximation.

23        Q.    And do you have a partner today?

24        A.    Yes.

25        Q.    What is the name of your current

Page 19

1                        MONIQUE AMODEO

2    partner?

3         A.      Officer Padolecchia.

4         Q.      Can you spell that, please?

5         A.      Padolecchia.

6         Q.      Did that officer succeed Officer

7    Stassi?

8         A.      No.

9         Q.      Was there someone in between?

10        A.      Yes.

11        Q.      Who was in between?

12        A.      Bruckbauer.

13        Q.      Can you spell that?

14        A.      Bruckbauer.

15        Q.      And do you know why that officer

16   stopped being your partner?

17               MS. BEN-SOREK:   Objection.

18        Q.      Do you know why that officer no

19   longer served as an SRO?

20        A.      Who?

21               MS. BEN-SOREK:   Objection.   You

22          can answer.   Once I tell you not to

23          answer --

24        A.      Who?   I don't know who you are

25   talking about.

1                     MONIQUE AMODEO

2        Q.      Bruckbauer?

3        A.      He went on to another assignment.

4        Q.      Now, prior to May of 2014, how

5    long had Officer Stassi been your partner?

6        A.      Prior to May.

7        Q.      Before May of 2014?

8        A.      I don't know.

9        Q.      Can you approximate?

10        A.      When he left it was about eight,

11    eight and a half years from the day he left.

12        Q.      Do you know why he left the

13    assignment as the SRO in Roosevelt?

14                    MS. BEN-SOREK:  Objection.  You

15            can answer.

16        A.      He went on to another assignment.

17        Q.      What is his current assignment?

18        A.      Marine Bureau.

19        Q.      Now, in May of 2014, were you

20    familiar with Washington Rose Elementary

21    School?

22        A.      Yes.

23        Q.      During the course of your job

24    duties, approximately how many times per

25    month did you have the occasion to go to

1                    MONIQUE AMODEO

2    Washington Rose?

3         A.      I don't have stats.

4         Q.      For what purposes would you

5    routinely go to Washington Rose?

6              MS. BEN-SOREK:  Objection to the

7          form of the question.  You can

8          answer.

9         A.      Child abuse, child neglect,

10   anything, weapons, mostly that.  Sex abuse.

11        Q.      Prior to May of 2014 or prior to

12   May 28th, 20124, had you ever gone to

13   Washington Rose Elementary School with

14   reference to the conduct of a teacher?

15        A.      Washington Rose?  No.

16        Q.      How about any facility within the

17   district?

18        A.      Yes.

19        Q.      And how many times?

20        A.      For a teacher, including aided

21   cases where they got sick?

22        Q.      Yes.

23        A.      I can't answer that then.

24        Q.      Did any of the calls, prior to

25   May 28, 2014, involve something other than an

1                    MONIQUE AMODEO

2   aided case?

3        A.     Yes.

4        Q.     How many?

5        A.     One that I can recall.

6        Q.     What were the circumstances?

7        A.     Rephrase that.

8        Q.     Why did you respond to that

9   situation?

10        A.     He needed to be -- he met the

11   Mental Hygiene Law.

12        Q.     What school was that?

13        A.     I believe that's the middle

14   school.

15        Q.     When was it?

16        A.     I have no recall.

17        Q.     Can you approximate?

18        A.     I can't.  Not that.

19        Q.     Now, prior to May 28, 2014, did

20   you know the assistant principal in

21   Washington Rose, Ms. Edith Higgins?

22        A.     Yes.

23        Q.     Had you ever met her?

24        A.     Yes.

25        Q.     How many times have you met her?

Page 23

1                    MONIQUE AMODEO
2        A.        Multiple.
3        Q.        And what about the principal, Mr.
4    Braswell, had you met him prior to May 28,
5    2014?
6        A.        Yes.
7        Q.        And how many times?
8        A.        Multiple.
9        Q.        I want to direct your attention
10   to May 28, 2014 May 28, 2014; were you
11   working on that day?
12       A.        Yes.
13       Q.        Were you working on that day as a
14   Nassau County police officer?
15       A.        Yes.
16       Q.        What tour were you working on
17   that day?
18       A.        0700 to 1700.
19       Q.        Did you have occasion on that day
20   to report to Washington Rose?
21       A.        Yes.
22       Q.        Approximately what time?
23       A.        I'd have to check my memo book.
24                 MR. WOLIN:  Why don't we mark
25           this?

Page 24

1          MONIQUE AMODEO

2              (Whereupon, at this time, the

3          above-mentioned memo book was marked

4          by the reporter as Plaintiff's

5          Exhibit 9, for identification, as of

6          this date.)

7      Q.      Before I show you that, I would

8  just like to ask you a couple of other

9  questions.  You realize you are a defendant

10 in this case; is that correct?

11     A.      Yes.

12     Q.      Have you ever been a defendant in

13 any other case arising from your duties as a

14 Nassau County police officer?

15     A.      Not that I recall.

16     Q.      Have you ever testified under

17 oath before today?

18     A.      Ever?

19     Q.      Yes?

20     A.      Yes.

21     Q.      How many times?

22     A.      I don't know.

23     Q.      What type of matters?

24     A.      Criminal cases.

25     Q.      Other than criminal cases, have

Page 25

MONIQUE AMODEO

1

2  you ever testified?

3      A.    No.  I don't think so.

4      Q.    Have you ever given a deposition

5  before like you are doing today?

6      A.    Not to my knowledge, no.

7      Q.    Have you ever been convicted of a

8  crime?

9              MS. BEN-SOREK:  Objection.

10     A.    No.

11             MR. WOLIN:  On what basis?  You

12         can ask somebody if they were ever

13         convicted of a crime.

14     Q.    So I will ask you to take a look

15  at Exhibit 9; have you ever seen that before?

16     A.    Uh-huh -- yes.

17     Q.    Are these excerpts from your memo

18  book?

19     A.    Yes.

20     Q.    What is a memo book?

21     A.    A daily ledger.

22     Q.    And you maintain this every day?

23     A.    Yes.

24     Q.    And what information is placed in

25  the memo book?

Page 26

1              MONIQUE AMODEO

2        A.      Assignments that we had gone on.

3        Q.      Is it part of your duties and

4   responsibilities to maintain a memo book?

5        A.      Yes.

6        Q.      Are you required to maintain a

7   memo book?

8        A.      Yes.

9        Q.      And does this excerpt pertain to

10   your visit to the Washington Rose School on

11   May 28th, 2014?

12        A.      Yes.

13        Q.      What time did you arrive at

14   Washington Rose on May 28th, 2014?

15        A.      I don't know what time we

16   arrived.

17        Q.      I see in the left-hand margin

18   there are time notations?

19        A.      Yes.

20        Q.      What do those time notations

21   reflect?

22        A.      1337 is the time that we were

23   called to Washington Rose.

24        Q.      And using that as a frame of

25   reference, approximately what time did you

1                MONIQUE AMODEO

2    arrive at Washington Rose?

3         A.    I would say shortly thereafter.

4         Q.    Did you arrive with Officer

5    Stassi?

6         A.    We drive together.

7         Q.    How did it come about that you

8    went to Washington Rose on May 28th, 2014?

9         A.    We received a phone call from the

10   a assistant principal.

11        Q.    And was that Ms. Higgins, if you

12   know?

13        A.    Yes.

14        Q.    If you know, what number did Ms.

15   Higgins use to contact you and Officer

16   Stassi?

17        A.    I don't know.

18        Q.    Hows was the call transmitted to

19   you?

20        A.    Rephrase.

21        Q.    Was it over your radio, was it on

22   the telephone?

23        A.    Cell phone.

24        Q.    It was on your cell phone?

25        A.    Yes.

Page 28

1              MONIQUE AMODEO

2        Q.      Was it your cell phone or Officer

3   Stassi's cell phone or some other cell phone?

4        A.      It was my phone.

5        Q.      Did you answer the cell phone?

6        A.      Yes.

7        Q.      Did you know how Ms. Higgins new

8   your cell phone number?

9        A.      I gave it to her.

10       Q.      When had you given it to her?

11       A.      When I met her, whenever that

12   was.

13       Q.      Sometime prior to May 28th?

14       A.      Yes.

15       Q.      You answered the phone?

16       A.      I did.

17       Q.      What did Ms. Higgins say?

18       A.      I can't tell you verbatim what

19   she said, but it was something to the effect

20   that we need to go up to the school, they had

21   an incident and that's all I can remember

22   from the details.

23       Q.      Did she tell you anything about

24   the incident?

25       A.      I don't remember if she said it

Page 29

1          MONIQUE AMODEO

2    over the phone or we were nearby and we said

3    we would be there shortly.  I don't recall

4    the conversation.

5          Q.    And do you recall her saying

6    anything else?

7          A.    No.

8          Q.    Did she say if anyone had

9    directed her to call?

10         A.    I don't recall.

11         Q.    Did you identify the name of the

12   individual she was calling about?

13         A.    I don't think at the time.  I

14   don't recall that.

15         Q.    Did Officer Stassi also speak to

16   her?

17              MS. BEN-SOREK:  Objection.  On

18         the phone?

19              MR. WOLIN:  Yes.

20         Q.    On the phone at that time?

21         A.    No.

22         Q.    So prior to your actual arrival

23   at Washington Rose, is it your testimony that

24   Ms. Higgins did not speak to Officer Stassi

25   while you were both in the car?

Page 30

1                    MONIQUE AMODEO

2          A.      That's correct.

3          Q.      So as far as you recollect, she

4    only spoke to you; is that correct?

5          A.      Yeah.  It's my phone.

6          Q.      And she called your phone, so

7    would there have been anyone else that she

8    would have spoken to in making that call

9    before you answered?

10         A.      I don't understand the question.

11   Say that again.

12         Q.      She called your cell phone,

13   right?

14         A.      Correct.

15         Q.      So you directly answered call?

16         A.      That's correct.

17         Q.      There was no one who transferred

18   the call to you; is that correct?

19         A.      That's correct.

20         Q.      So to the best of your

21   recollection, did Ms. Higgins say anything

22   else that you haven't told me about at that

23   time?

24         A.      Not that I recall.

25         Q.      After you finished speaking to

1              MONIQUE AMODEO

2    Ms. Higgins, did you speak to Officer Stassi?

3         A.      Yes.

4         Q.      Who was driving the patrol car?

5         A.      I am.

6         Q.      And did you say anything to

7    Officer Stassi after receiving the call from

8    Higgins?

9         A.      Yeah.  We have to go to

10   Washington Rose.

11        Q.      Did you say anything else?

12        A.      They have an incident there.  I

13   don't know if --

14        Q.      Is it your testimony that you

15   knew nothing about the incident?

16        A.      I don't recall what I knew about

17   the incident.

18        Q.      Do you remember where you were

19   when you received the call?

20        A.      I do not.

21        Q.      Do you remember how long it took

22   you to get to the school?

23        A.      I do not.

24        Q.      When you got to the school, what

25   happened?

1          MONIQUE AMODEO

2          A.      We responded to the main office,

3     greeted by Ms. Higgins and I believe that's

4     when she had gone into the details of the

5     event.

6          Q.      So it's your testimony that the

7     first person you spoke to when you arrived at

8     the school was Ms. Higgins?

9          A.      We could agree that somebody

10    greeted us prior to that.

11         Q.      Did you speak to Mr. Braswell,

12    the principal.

13         A.      I don't think so.  Well, not

14    before Ms. Higgins.

15         Q.      So it's your recollection that

16    you spoke to Ms. Higgins before you spoke to

17    Mr. Braswell; is that correct?

18         A.      I don't recall.  I can't clearly

19    say how the sequence of events went down.  I

20    did speak to both of them that day.

21         Q.      But you believe that you spoke to

22    Ms. Higgins first?

23         A.      I believe so.

24         Q.      And when you spoke to Ms. Higgins

25    initially, was anyone else present, besides

Page 33

1          MONIQUE AMODEO

2    Ms. Higgins --

3          A.     In the office?

4          Q.     Yes.

5          A.     I don't recall.

6          Q.     So when you spoke to Ms. Higgins,

7    what was the conversation?

8          A.     She went into detail as to why

9    she called.

10         Q.     What did she say?

11         A.     They had a teacher who was

12   hysterical, threatened to kill herself, was

13   so physically and emotionally excited that

14   she needed to be -- they needed to wheelchair

15   to get her through the building.

16         Q.     Did she tell you when that had

17   occurred?

18         A.     Yes.

19         Q.     And what did she say?

20         A.     Whatever -- it was prior to her

21   calling us.  It was earlier in the day.

22         Q.     Was that the only conversation

23   you had with Ms. Higgins that day?

24         A.     I probably spoke to her more than

25   once, because we spoke-to -- we then spoke to

Page 34

1                     MONIQUE AMODEO

2    Braswell, whichever sequence of events and we

3    spoke to other people as well.

4         Q.      Initially, what, if anything

5    else, did Ms. Higgins say?

6         A.      That was the sum and substance of

7    what she said.

8         Q.      Did she tell you where Ms.

9    McCarthy was?

10        A.      Yes.

11        Q.      And did she identify the person

12   as Ms. McCarthy?

13        A.      At that point, yes.

14        Q.      Do you know who Ms. McCarthy was?

15        A.      No.

16        Q.      Had you ever, to your knowledge,

17   met her before?

18        A.      Not to my knowledge.

19        Q.      Where did she say Ms. McCarthy

20   was?

21        A.      At her sister's house.

22        Q.      Did she tell you that she had

23   spoken or somebody had spoken to the sister

24   and Ms. McCarthy was calm?

25        A.      She didn't tell us she was calm.

1            MONIQUE AMODEO

2    She was removed from scene by her sister

3    immediately after they used a wheelchair to

4    get her out, yes.

5         Q.    Did she tell you what time she

6    had been removed from the school in a

7    wheelchair?

8         A.    I don't know if she gave us an

9    exact time.  It was earlier than they had

10   called us.

11        Q.    Approximately how much earlier;

12   did she tell you?

13        A.    I'm sure she gave us around about

14   figure off of the top of my head.  It's not

15   in my book, so I don't know.

16        Q.    Did you form a belief at the time

17   as to how much earlier it was that Ms.

18   McCarthy was removed from the school?

19        A.    Yeah.  We had an approximation.

20        Q.    What was that approximation?

21        A.    I don't know it now.  I knew I

22   then.

23        Q.    Do you remember what you then

24   knew to be the time frame?

25        A.    Say that again.

Page 36

1        MONIQUE AMODEO

2        Q.      Do you know now what you then

3    knew to be --

4        A.      I don't know now what I knew

5    then.    That's what I'm saying.

6        Q.      But it was sometime before you

7    had arrived; is that correct?

8        A.      Correct.

9        Q.      And did Ms. Higgins tell you that

10   somebody had called to see how Ms. McCarthy

11   was doing?

12       A.      No.

13       Q.      Did anyone tell you that they had

14   called to see how Ms. McCarthy was doing?

15       A.      No.

16       Q.      While you were at Washington

17   Rose, did anyone tell you that someone had

18   spoken to Ms. McCarthy or her sister and she

19   was considerably calmer than she had been

20   when she left the school?

21       A.      No.

22       Q.      You indicated that to the best of

23   your recollection when you first arrived you

24   spoke to Ms. Higgins; is that correct?

25       A.      That's correct.

Page 37

1                    MONIQUE AMODEO

2        Q.      Then who, if anyone, did you

3   speak to next?

4        A.      Again, the sequence of events is

5   not clear, however, we did speak to Mr.

6   Braswell who confirmed that Ms. McCarthy --

7   Ms. McCarthy threatened to kill herself.

8        Q.      Did Mr. Braswell say what the

9   basis of his knowledge was?

10        A.      I believe he said he heard it.

11        Q.      So according to your testimony,

12   according to your recollection, you believe

13   that Mr. Braswell said he had heard Ms.

14   McCarthy say that?

15        A.      Mr. Braswell heard Ms. McCarthy,

16   yes.

17        Q.      Is that what your understanding

18   was at the time?

19        A.      I believe so.

20        Q.      Was that your understanding based

21   upon what Mr. Braswell had told you at the

22   time?

23        A.      Yes.

24        Q.      What, if anything, else was said

25   between you and Mr. Braswell at that time?

1          MONIQUE AMODEO

2          A.    I don't recall specifics.

3          Q.    How many times that day did you

4    speak to Mr. Braswell concerning the

5    situation?

6          A.    I would say just at the time we

7    were at the school.

8          Q.    Just that one time?

9          A.    Yes.

10          Q.    How long were you in the school

11    for?

12          A.    It's a very poor copy.  Can you

13    see what time?  The line below that we were

14    at Washington Rose, the next line, can you

15    see that time?  Does that say 51?

16          Q.    Well, that's the copy I received.

17          A.    I can't read it.  There's a line

18    through it.

19          Q.    Does it say 1357?

20          A.    I don't know.  I can't read it.

21          Q.    But if it says 1357, then that

22    would mean you were there for twenty minutes,

23    right?

24          A.    Right.  If it's 1351, we were

25    there for fourteen minutes.

Page 39

1                MONIQUE AMODEO

2        Q.      Based upon your independent

3    recollection, does that seem correct that you

4    were there anywhere from fourteen to twenty

5    minutes?

6        A.      If that's what it says, that's

7    when we were there.

8        Q.      During that fourteen- to

9    twenty-minute period, you spoke to Ms.

10   Higgins, right?

11       A.      Yes.

12       Q.      And you recounted that

13   conversation as best as you recollect?

14       A.      Yes.

15       Q.      Was that the only time that you

16   spoke to Ms. Higgins that day?

17       A.      That day?  Yeah, I believe that

18   it was.  I think that was the only time we at

19   Washington Rose.  I don't know if he

20   Washington Rose any other time during that

21   day.  I doesn't say, so I'm guessing now.

22       Q.      You indicated that you spoke to

23   Mr. Braswell; was that the only time you

24   spoke to Mr. Braswell that day?

25       A.      I believe so with regard to that

Page 40

MONIQUE AMODEO

1
2  incident.
3      Q.     Did you speak to him at any other
4  time that day about anything else?
5      A.     Not to my knowledge.
6      Q.     So other than Mr. Braswell and
7  Ms. Higgins, who if anyone else, did you
8  speak to at Washington Rose concerning this
9  incident?
10     A.     We spoke to the school
11  psychologist.
12     Q.     Was that Ms. Swinkin?
13     A.     Swinkin, yes.
14     Q.     And did you speak to anybody
15  else?
16     A.     We spoke to a teacher that I
17  don't know the name of.
18     Q.     Now, while all these
19  conversations that were happening, were you
20  and Officer Stassi present at the same time?
21     A.     We might not have been.  One
22  might have been speaking to one while the
23  other was speaking to another.
24     Q.     During your conversation with Mr.
25  Braswell, were you both present together at

Page 41

MONIQUE AMODEO

1   the same time?

2        A.    I don't know.

3        Q.    But you remember specifically

4   that you were present during the Braswell

5   conversation; is that correct?

6        A.    Yes.

7        Q.    What about the Higgins

8   conversation, do you remember if you both

9   were present --

10       A.    I mean --

11             MS. BEN-SOREK:  Let him finish.

12       Q.    Do you remember if you were both

13  present during the Higgins conversation?

14       A.    I believe we were.  I don't know

15  for certain.

16       Q.    What about during the Swinkin

17  conversation, were you both present?

18       A.    I believe we were both present

19  for that.

20       Q.    I just want to show you what we

21  marked this morning during another deposition

22  as Exhibit 8, which is an incident report

23  that was provided by the school psychologist,

24  Ms. Swinkin.  I want to direct your attention

Page 42

MONIQUE AMODEO

1
2    to the end of this.  I'm not going to read it

3    into the record, but look at the last

4    paragraph which goes onto the next page.  Do

5    you see where it says, "At the end of the

6    school day I was called into the principal's

7    officer.  When I arrived there was a school

8    resource officer waiting for me."

9        A.    Okay.  Can.

10       Q.    Can you read from that point on?

11       A.    To myself?

12       Q.    Yes, to yourself.

13             (Short pause in proceedings.)

14             MR. WOLIN:  While she's reading

15         that, let's take a two second break.

16             (Whereupon, at this time, a brief

17         recess was taken.)

18       Q.    Have you reviewed that?

19       A.    Yes.

20       Q.    You said you were present during

21   the entire interaction with the school

22   psychologist?

23       A.    I did not say I was present

24   during the entire.  I said I was present with

25   my partner and we did speak to her.

Page 43

1         MONIQUE AMODEO

2     Q.      So are you saying you were

3  present the entire time?

4     A.      I'm not saying I was present the

5  entire time.  It's not -- this is -- this has

6  a lot of moving parts.  So it's not like I

7  speak to you, we move on.  We then might have

8  to go back to speak to you.  I move on, I

9  speak to somebody else.

10            So I can't tell you at what time

11  where I was, when I was with him, when I

12  wasn't with him, what was stated.  I could

13  tell you that he and I were with her at a

14  certain time together, what time that was, I

15  can't tell you.

16     Q.      Now, she refers to he, so I

17  assume she is referring to Officer Stassi,

18  she says, "He then told me that I should not

19  have let her go home and that they will now

20  go to her house"; do you remember Officer

21  Stassi saying that?

22     A.      We had told her that she should

23  not have let her -- we reiterated the Mental

24  Hygiene Law to her to see if she was familiar

25  with it.  If he said that again when I wasn't

Page 44

1          MONIQUE AMODEO

2    there, I can't speak of that, but I was there

3    when we told her she should not let her

4    leave.

5          Q.    Why did you believe she should

6    not have let her leave?

7          A.    She made a threat against herself

8    and she was visibly emotionally shaken the

9    way she was, she meets the Mental Hygiene

10   Law.

11         Q.    What section of the Mental

12   Hygiene Law were you citing?

13         A.    I wasn't citing.  I was telling

14   her what we know.  I don't have a section.

15         Q.    Well, you said you referred to

16   the Mental Hygiene Law.

17         A.    We know it sum and substance.  We

18   know what we can do.

19         Q.    What in sum and substance does

20   the Mental Hygiene Law say concerning this

21   situation?

22         A.    If somebody is threat to

23   themselves or somebody else, they can be

24   shipped for an eval against their will.

25         Q.    Now, did you hear Ms. Higgins say

Page 45

1                    MONIQUE AMODEO

2     that she didn't believe that Ms. McCarthy was

3     a threat?

4          A.       She never said that in my

5     presence.

6          Q.       Do you know if she said it in

7     Officer Stassi's presence?

8          A.       I don't know.

9          Q.       Is it your testimony that no one

10    told you that they had checked with Ms.

11    McCarthy at her sister's house and that she

12    had calmed down; nobody told you that?

13         A.       Nobody told me that.

14         Q.       And she then states here, again

15    she refers to he, so I assume she's talking

16    about Officer Stassi, "He told me to give him

17    my badge and my contact information,

18    including telephone number, address and date

19    of birth, which I did.  Then the SRO asked me

20    for my license number."  Did that happen in

21    your presence?

22         A.       That did not happen in my

23    presence.  We need her contact information,

24    name, date of birth, address for the case

25    report.

Page 46

1          MONIQUE AMODEO

2      Q.      But what about her license

3  number?

4      A.      I don't know anything about that.

5      Q.      Then it says, "He," again I

6  assume she's referring to Officer Stassi,

7  "Then told me that I should be aware of the

8  consequence of my actions and that he's going

9  to report me to the state"; do you remember

10  that being said?

11      A.      No.

12      Q.      Now, who, if anyone else, did you

13  speak to in the school that day concerning

14  the situation?

15      A.      A friend of Ms. McCarthy that was

16  there and witness to the incident.  I don't

17  have her name.

18      Q.      Was that another teacher?

19      A.      Yes.

20      Q.      Was that Mrs. Beno?

21      A.      I don't know.

22      Q.      Do you have any writing which

23  would indicate who that person was that you

24  spoke to?

25      A.      No.

Page 47

1                      MONIQUE AMODEO

2          Q.     Did you make a case report?

3          A.     Yeah.  I'm sure we did.

4          Q.     And did the case report indicate

5    everyone you spoke with?

6          A.     Probably not.

7          Q.     So was anyone else present when

8    you spoke to Ms. Beno or whoever it was?

9          A.     I don't recall.

10         Q.     And were both you and Officer

11   Stassi present?

12         A.     I don't recall.

13         Q.     But you remember you spoke to

14   her; is that correct?

15         A.     Yes.

16         Q.     And what did you say to her, what

17   did she say to you?

18         A.     She confirmed all that the

19   assistant principal and principal had told

20   us.  She said that she was, I believe,

21   personal friends with her and she was very

22   upset.  She said she was an emotional wreck

23   and confirmed she had to be taken out, she

24   couldn't walk, in a wheelchair.

25         Q.     Did she tell you that she had

```
 1                   MONIQUE AMODEO
 2   spoken to Ms. McCarthy or her sister?
 3         A.      She did not.  Can I just check my
 4   cell phone.
 5                   MR. WOLIN:  Sure.
 6                   (Discussion held off the
 7              record.)
 8         Q.      So who, if anyone else, did you
 9   speak to?  You said you spoke to Ms. Higgins,
10   Mr. Braswell, a friend of Ms. McCarthy whose
11   name you're not sure about and the school
12   psychologist; did you speak to anybody else?
13         A.      I believe that was it.
14         Q.      Now, am I correct that at some
15   point while you were in Washington Rose you
16   and Officer Stassi made the decision to go to
17   the residence where Ms. McCarthy was; is that
18   correct?
19         A.      That's correct.
20         Q.      And who made that decision?
21         A.      We both did.
22         Q.      Why did you make that decision?
23         A.      Because we needed to follow-up.
24         Q.      Follow-up what?
25         A.      Follow-up with the threat that
```

Page 49

MONIQUE AMODEO

2  she made to kill herself.

3      Q.     Again, who was your source of

4  that alleged statement?

5      A.     Those four people you just

6  mentioned.

7      Q.     They all told you that she had

8  threaten to kill herself?

9      A.     Yes.

10      Q.     And did they say it in those

11  words?

12      A.     Yes, they threatened -- she

13  threatened to kill herself.

14      Q.     And then you left the school and

15  proceeded where?  You can look at your memo

16  book.

17      A.     Somewhere around Sportsman Drive.

18  I can't see it.  There's a line through it.

19      Q.     Is there any reason why there's a

20  line through it?

21      A.     Because the copier looks like

22  it's horrible.  It's a horrible copy.

23      Q.     If I saw the original would there

24  be a line there?

25      A.     No.  There shouldn't be, no.

1        MONIQUE AMODEO

2            MS. BEN-SOREK:  I will check my

3        copy.

4            MR. WOLIN:  Do you have the

5        original.

6            MS. BEN-SOREK:  I don't have the

7        original, but I will check the copy

8        that I received from the PD.  If it's

9        any better than this, I will

10       recirculate.

11    Q.    So this excerpt from the memo

12  book says what?

13    A.    It says we were en route to a

14  certain numerical on Sportsman Drive.

15    Q.    Why don't you tell me from left

16  to right exactly everything that was said.

17    A.    From left to right?  The time

18  that we were en route to a location on

19  Sportsman Drive in Freeport in regards to the

20  investigation of Washington Rose.

21    Q.    What does it actually say between

22  the time --

23    A.    It says 1080.

24    Q.    What does 1080 mean?

25    A.    En route.

1          MONIQUE AMODEO

2          Q.      And then it says to, looks like

3    233 Sportsman Drive Freeport, right?

4          A.      Correct.

5          Q.      What does it say after that?

6          A.      In regards.

7          Q.      And that's a reference to the

8    entry above that?

9          A.      Correct.

10         Q.      Now, there are entries below

11   that.  Does that have anything to do with

12   this situation?

13         A.      I believe it's 1600 we were clear

14   from that assignment, with the case report of

15   318938 and then we took meal.

16         Q.      107?

17         A.      Correct?

18         Q.      So does this mean that you were

19   on that assignment up until 1600?

20         A.      Correct.

21         Q.      So you left Washington Rose and

22   you went to the residence on Sportsman,

23   right?

24         A.      Yes.

25         Q.      How long did it take you to get

Page 52

1                    MONIQUE AMODEO

2    there?

3         A.      I don't know.

4         Q.      Well, you know, it's all within

5    the First Precinct.

6         A.      No, it's not.

7         Q.      Freeport is not in the First

8    Precinct?

9         A.      Correct.

10        Q.      So do you remember how long it

11   took you to get there?

12        A.      I responded no.  I don't know.

13        Q.      Can you approximate how long it

14   took you to get there?

15        A.      That's close to --

16             MS. BEN-SOREK:  Don't guess if

17        you don't have a basis for it.

18        A.      No, I have nothing.  I don't know

19   what traffic was like.

20        Q.      Did you have you of siren on?

21        A.      Siren?

22        Q.      The emergency --

23             MS. BEN-SOREK:  Sirens.

24        Q.      Your flashing lights or whatever?

25        A.      I don't believe so.  I don't

Page 53

1                    MONIQUE AMODEO

2    think that we had our emergency lights on.

3         Q.    So you were just proceeding there

4    in regular traffic; is that correct?

5         A.    I don't recall if at an

6    intersection, if it was red, if we went

7    through it.  I don't recall.

8         Q.    But in any case at some point you

9    got to the residence; is that correct?

10        A.    Yes.  We got there safely.

11        Q.    And you and Officer Stassi both

12    arrived there; is that correct?

13        A.    Yes.

14        Q.    And was there any conversation

15    between you and Officer Stassi concerning

16    this matter en route to that house?

17        A.    I'm sure there was.

18        Q.    Do you remember?

19        A.    I'm sure that we were discussing

20    the Mental Hygiene Law.

21        Q.    And what were you discussing

22    about the Mental Hygiene Law?

23        A.    We were shocked they allowed her

24    to leave.

25        Q.    Why were you shocked that they

Page 54

1                  MONIQUE AMODEO

2    allowed her to leave under the Mental Hygiene

3    Law?

4         A.      Because she should have been sent

5    for an evaluation.

6         Q.      So it's your belief that rather

7    than being sent to her sister's home with her

8    sister, she should have gone to a medical

9    center for an evaluation?

10        A.      Yes.

11        Q.      And that's based upon your

12   belief, but obviously you weren't there at

13   the time that she was there.

14        A.      I had four eyewitnesses that

15   confirmed the same exact story and a

16   psychologist as one of the four.

17        Q.      Well, I'm not going to get into

18   other testimony, but be that as it may you

19   arrived there with Officer Stassi; is that

20   correct?

21        A.      Yes.

22        Q.      What happened when you arrived?

23        A.      We went to the door.  I believe

24   McCarthy's sister answered the door and

25   invited us in.

1                MONIQUE AMODEO

2        Q.      Do you know of anyone from the

3    school had called Ms. McCarthy or her sister

4    to state that you were on you way?

5        A.      I have no idea if anybody from

6    the school called her.

7        Q.      When you left Washington Rose,

8    did you tell anyone that you were going to go

9    to the residence?

10       A.      We told everyone.

11       Q.      And when you say you told

12   everyone, who did you tell?

13       A.      The four that we are speaking of.

14       Q.      You told them collectively or

15   each time you had a conversation?

16       A.      I don't know if it was

17   collectively or if it was two at a time or if

18   it was one and three, if it was all

19   individuals.  All four of them knew -- excuse

20   me, three of them.

21       Q.      Who are the three?

22       A.      Higgins, Braswell and Swinkin.

23       Q.      What, if anything, did Higgins

24   say when you said you were going to the

25   house?

Page 56

1                    MONIQUE AMODEO

2        A.       I don't recall.

3        Q.       Do you recall what Braswell said

4    when you said you were going to the house?

5        A.       No.   I don't recall it.

6        Q.       Do you recall what Swinkin said

7    after you said you were going to the house?

8        A.       No.

9        Q.       Did anyone protest the fact that

10   you said you were going to the house?

11       A.       No, not at all.

12       Q.       So you got to the house, right,

13   you are both in uniform, right?

14       A.       Correct.

15       Q.       Did you knock on the door?

16       A.       Or rang the bell.

17       Q.       Who answered; the sister?

18       A.       Correct.

19       Q.       And did you identify yourself?

20       A.       Did I need to.   I was in full

21   uniform.

22       Q.       Did you say why you were there?

23       A.       We wanted to see her sister and

24   speak to her.

25       Q.       Did you say why?

Page 57

1                    MONIQUE AMODEO

2        A.      No.

3        Q.      What, if anything, did the sister

4   say?

5        A.      Come in.

6        Q.      Was she friendly?

7        A.      Very.

8        Q.      And what then happened?

9        A.      We met Ms. McCarthy and I believe

10  upstairs in the main -- I think it was up the

11  stairs.  I'm not sure.

12       Q.      You both you and your partner

13  went upstairs?

14       A.      Yes.  The main floor, whatever

15  the main floor of the house was.  I don't

16  recall.

17       Q.      Do you remember what room it was

18  that you saw her?

19       A.      I believe like a living room

20  combination maybe.

21       Q.      And did you observe Ms. McCarthy?

22       A.      Yes.

23       Q.      And where was she when you

24  observed her?

25       A.      I don't recall where she was when

Page 58

1                      MONIQUE AMODEO

2    I first engaged with her, but we did have a

3    conversation in the living room.

4         Q.      And do you remember if she was

5    standing or sitting?

6         A.      I don't recall.

7         Q.      And were both you and Officer

8    Stassi there at the same time?

9         A.      Yes.

10        Q.      So you both were there during the

11   entire encounter with Ms. McCarthy?

12        A.      Yes.

13        Q.      And can you tell me what you said

14   or what Officer Stassi said and what Ms.

15   McCarthy said, if anything?

16        A.      I can't tell you who said what.

17   I could tell you generally what we spoke

18   about.

19        Q.      Okay.

20        A.      We told her why we were there.

21        Q.      Why did you say you were there?

22        A.      We received a call from

23   Washington Rose and they told us that she

24   made a threat to kill herself, she was

25   emotionally distraught and physically and she

1                    MONIQUE AMODEO

2    had to be removed from scene by wheelchair

3    and her sister picking her up.

4         Q.    What did you mean by saying she

5    had to be removed from the scene?

6         A.    Clearly she wasn't capable of

7    walking under her own free will, they used a

8    wheelchair.

9         Q.    Other than fact that she left in

10   a wheelchair, what other reason do you have

11   believe that she wasn't capable of walking

12   out on her own free will?

13        A.    Because she didn't.

14        Q.    Other than that, is there any

15   other reason?

16        A.    No, other than testimony from

17   everybody else, what they gave us.

18        Q.    What else, if anything, did you

19   or Officer Stassi say to Ms. McCarthy?

20        A.    More of the same.  We quoted --

21   we basically gave her a generalization of the

22   Mental Hygiene Law.

23        Q.    What did you say about the Mental

24   Hygiene Law?

25        A.    That if she was a threat to

Page 60

1                    MONIQUE AMODEO
2      herself or somebody else, that she would need
3      an evaluation and she was very displeased
4      with that and got very emotional and very
5      excited at that point.
6          Q.     Do you know how long had past
7      between the time she left the school and your
8      arrival in the house?
9          A.     Right now do I?
10         Q.     Yes.
11         A.     No.  I don't recall.
12         Q.     Can you approximate?
13         A.     Can you show me some paperwork?
14         Q.     Would it be in the case report?
15         A.     Maybe.  Yeah, probably.
16                MR. WOLIN:  Mark this.
17                (Whereupon, at this time, the
18            above-mentioned case report was
19            marked by the reporter as Plaintiff's
20            Exhibit 10, for identification, as of
21            this date.)
22         Q.     Have you ever seen that document
23      before?
24         A.     Yes.
25         Q.     What is it?

1          MONIQUE AMODEO

2      A.     Case report.

3      Q.     Who actually inputted the

4  information on this case report?

5      A.     When you say actually inputted,

6  do you mean typed?

7      Q.     Typed it?

8      A.     Data.

9      Q.     Yes?

10     A.     Data, data processing.  A

11 civilian.

12     Q.     Who wrote the words?

13     A.     Who dictated it?

14     Q.     Yes?

15     A.     Officer Stassi.

16     Q.     And did you hear him dictate it?

17     A.     I don't recall.

18     Q.     By the way, when was it dictated?

19     A.     It says -- it doesn't.  It

20 normally says what time it's called in.

21     Q.     Now, there's a date on top, it

22 says 9/9/2014?

23     A.     That's means it was just printed

24 at that time.

25     Q.     That means when it was printed,

Page 62

1                    MONIQUE AMODEO

2    right?

3         A.       I believe so.  The time of the

4    occurrence is 10:45, to answer your question.

5         Q.       It says 10:45, so that would be

6    the --

7         A.       The time of occurrence.

8         Q.       The occurrence meaning when she

9    was in the school and at or about the time

10   she left, right?

11        A.       It was when the incident

12   happened.  She could have an hour after that.

13   I don't know what time, but that time is the

14   time she had made the threat around.  I don't

15   know if I have the exact time that she left

16   or if they gave us the exact time when she

17   left.

18        Q.       And the 1337 signifies what?

19        A.       The time that we went status to

20   at school.

21        Q.       When you first arrived in the

22   house and saw Ms. McCarthy, describe her

23   demeanor.

24        A.       I'm just reading this.

25        Q.       Okay.

Page 63

1                    MONIQUE AMODEO

2        A.      Okay.  Say it again.

3        Q.      When you first saw Ms. McCarthy

4    when you entered the house, describe her

5    demeanor.

6        A.      She was calm, but you could see

7    that she had been upset.

8        Q.      Was she crying?

9        A.      I don't recall at the time if she

10   was crying.  I could she had been upset.

11       Q.      But at the moment she was calm?

12       A.      Yes.

13       Q.      When you say you could see she

14   was upset, what do you base that statement

15   on?

16       A.      Her overall appearance.

17       Q.      What about her overall

18   appearance?

19       A.      Meaning make-up was messed or

20   hair or -- it was a visible sign that she had

21   been upset.

22       Q.      Based upon what, her make-up was

23   streaked?

24       A.      I just remember that she -- you

25   could see she was upset and she stated she

Page 64

MONIQUE AMODEO

was upset.

Q.    But she didn't appear to he upset at that moment; is that correct?

A.    When she started talking about the incident she was.

Q.    But not when --

A.    When we first walked in, when we first observed her, she seemed calm.  Once we started talking to her is when she got excited again.

Q.    What, if anything else, did you say to her at that time?

A.    We were just in conversation with her, just trying to gauge how she was doing.  She was already -- she told us that she had already planned on suing the district.  She a personal problem with Mr. Braswell.  Mr. Braswell was singling her out, picking on her.  She couldn't take it anymore.  They happen to be in a meeting when she felt that he either embarrassed her or spoke poorly to her or wrote her up or something to that effect and that's what precipitated her meltdown.

Page 65

1                         MONIQUE AMODEO

2         Q.        What, if anything else, did you

3    or Officer Stassi say to her?

4         A.        Okay.  Do what you want to do

5    with the school district, but, you know, we

6    were here specifically for the threat.

7         Q.        And then what, if anything else,

8    did you or Officer Stassi say?

9         A.        Again, verbatim I don't know.  We

10   spoke to her for a little while.  As she as

11   got more and more excited, when we were

12   talking about it, we requested an ambulance

13   to come to scene.

14        Q.        And for what purpose did you

15   request an ambulance?

16        A.        To take her to the medical

17   center.

18        Q.        Now, was it your intent that she

19   go to the medical center before you arrived

20   at the premises?

21        A.        No.  We had to -- we had to

22   establish, we were go to speak to her and

23   figure out if she still met the criteria.

24        Q.        By your testimony, what you have

25   testified to as to what you were told by the

Page 66

1                    MONIQUE AMODEO

2        people in the school district, is it your

3        testimony that that was not sufficient to

4        have her transported to the medical center?

5             A.     Well, some time had gone by, so

6        we need to reevaluate and we did.

7             Q.     Tell me everything that you based

8        your evaluation on, which lead to her being

9        transported to the medical center.

10            A.     Well, she reiterate that she said

11       she wanted to kill herself.

12            Q.     So it's your testimony she

13       reiterated that?

14            A.     Yes.  She told us that, yes, she

15       indeed say that.

16            Q.     And is that contained in the case

17       report?

18            A.     No.

19            Q.     Don't you think that's an

20       important fact?

21                   MS. BEN-SOREK:  Objection.  You

22            can answer.

23            Q.     Don't you think that's important

24       fact?

25                   THE WITNESS:  You said answer?

1              MONIQUE AMODEO

2              MS. BEN-SOREK:  Yes, answer.

3         A.    No.

4         Q.    Why is it not an important fact?

5         A.    Because we had the school

6    psychologist that said that she put the

7    threat out.  We went back there, we confirmed

8    that there was a threat and that we weren't

9    comfortable leaving her home.

10        Q.    But you didn't think it was

11   necessary to put that in?

12        A.    I didn't call in the case report.

13        Q.    Now, it was your job in going

14   there to make an independent assessment as to

15   whether or not she was a threat, right?

16        A.    Yes.

17        Q.    And you weren't relying on what

18   you had been told at the school; is that

19   correct?

20        A.    It gave us some influence.

21        Q.    Did you feel that what you were

22   told at the school was sufficient cause to

23   have her transported to the medical center?

24        A.    Normally, yes.

25        Q.    What do you mean normally yes?

Page 68

1              MONIQUE AMODEO

2      A.      Normally yes.  The difference was

3  the time difference.

4      Q.      So when you arrived at the

5  residence, was it your intent that she be

6  transported to the hospital, without even

7  knowing what your interaction would be?

8      A.      No.

9              MS. BEN-SOREK:  Asked and

10         answered.  You can answer.

11     A.      No.  If that was -- if that was

12  what we thought, we would have requested the

13  bus at the time.  We evaluated her and then

14  requested the bus.

15     Q.      So tell me each and every factor

16  that you utilized in your evaluation, which

17  led to your calling the ambulance?

18             MS. BEN-SOREK:  Objection.  You

19         can answer.

20     A.      Say that again.

21     Q.      Tell me each and every factor

22  that you relied upon in determining to call

23  the ambulance?

24     A.      Her demeanor, the way she

25  responded and the things that she said.

1          MONIQUE AMODEO

2     Specifically, the fact that she did tell us

3     that she wanted to kill herself was a pretty

4     big one.

5          Q.     Is that contained any writing

6     anyplace?

7          A.     Clearly not.

8          Q.     And am I correct that her

9     demeanor only changed once you started

10    talking to her, right?

11         A.     Yeah, once we you started

12    talking.

13         Q.     At what point in the conversation

14    did she start getting upset?

15         A.     I don't recall what point it was.

16         Q.     But it was during --

17         A.     As soon as she saw us she was,

18    you know, a little uneasy.

19         Q.     Well, did you think that it was

20    inappropriate for her to be uneasy when she

21    sees two police officers coming into the

22    house?

23              MS. BEN-SOREK:  Objection.  You

24         can answer.

25         A.     No.

Page 70

1                    MONIQUE AMODEO

2        Q.     So you don't fault her for being

3   upset by the fact that two police officers

4   without notice come to her place of residence

5   where she was?

6        A.     That wasn't her place of

7   residence.

8        Q.     I said where she was.

9        A.     Where she was.  Do I think it's

10  inappropriate?

11       Q.     To be upset when two police

12  officers come unannounced --

13       A.     No not after -- not after --

14              MS. BEN-SOREK:  You got to let

15          him finish the question.

16       Q.     The question is, do you think

17  it's inappropriate for someone to be upset

18  when two police officers in uniform come to

19  where you are at without notice and start

20  asking you questions?

21       A.     No.  I don't think it's

22  appropriate.

23       Q.     You don't think it's appropriate

24  to be upset?

25       A.     No, not really.  After the

Page 71

1                      MONIQUE AMODEO

2    display that happened at the school, I would

3    think it would not be.

4         Q.     You, of course, were not a

5    witness to the "Display" that happened in the

6    school; is that correct.

7         A.     No, sir.

8         Q.     So what, if anything else, did

9    you rely upon in determining that an

10   ambulance should be called?

11        A.     All that I mentioned.

12        Q.     Anything else?

13        A.     Not that I recall.

14        Q.     So to summarize, I think you said

15   that she again became upset once you and

16   Officer Stassi started talking to her, right?

17        A.     Yes.

18        Q.     And the fact that you claim that

19   she again threatened to hurt herself or kill

20   herself; is that correct?

21        A.     She confirmed it.

22        Q.     Which is not in writing anyplace;

23   is that correct?

24               MS. BEN-SOREK:  Objection.

25        Q.     Did you rely on anything else?

Page 72

1                    MONIQUE AMODEO

2        A.      No.

3        Q.      Did you confer with Officer

4   Stassi about whether an ambulance should be

5   called?

6        A.      We were on the same page.

7        Q.      Tell me how you know that you

8   were on the same page?

9        A.      Because we worked together long

10  enough to know.

11       Q.      Did you speak to anyone else

12  before you made the decision to call the

13  ambulance?

14       A.      No.

15       Q.      Did you contact your supervisor?

16       A.      Not to my knowledge.

17       Q.      Why didn't you contact the

18  supervisor?

19       A.      We didn't have a need to contact

20  the super.

21       Q.      Isn't there a protocol that you

22  could in that situation have contacted a

23  supervisor?

24       A.      We didn't have a need.

25               MS. BEN-SOREK:   Objection.

Page 73

MONIQUE AMODEO

1

2       Q.      But the bottom line is you did
3   not contact the supervisor; is that correct?
4       A.      That is correct.
5       Q.      Tell me what else was said
6   between you, Officer Stassi and Ms. McCarthy,
7   prior to you having her transported to the
8   hospital?
9       A.      She willingly came with us to the
10  hospital.  She wanted, I believe, to either
11  change or grab sneakers, I don't remember,
12  but I escorted her to wherever she wanted to
13  go and get whatever it was she needed and
14  then she walked out with us un-handcuffed.
15      Q.      She walked out under her own
16  power?
17      A.      Yes.
18      Q.      Did she have to be escorted?
19      A.      Meaning?
20      Q.      Did she have to be restrained in
21  any way?
22      A.      We did not restrain her.
23      Q.      Did you make any contact with her
24  as you were escorting her out?
25                  MS. BEN-SOREK:   Objection to

Page 74

1                    MONIQUE AMODEO

2          form.   You can answer.

3      A.      I don't understand the question.

4      Q.      Did you take her by the arm or by

5   the hand or anything else like that as you

6   were escorting her out?

7      A.      No.

8      Q.      At any time did you touch her

9   person?

10     A.      Not that I recall, but --

11     Q.      But what?

12     A.      But if we did, it might have been

13  to assist her.  It's a high step up into the

14  ambulance.

15     Q.      Other than the possibility of

16  that, did Officer Stassi make any bodily

17  contact with her?

18     A.      Not that I recall.

19     Q.      Now, who told her that she was

20  going to be transported to the hospital?

21     A.      I don't recall.

22     Q.      And what was her reaction, if

23  any?

24     A.      She was upset.

25     Q.      Was she upset prior to being told

Page 75

MONIQUE AMODEO

1
2    she's going to be transported to the
3    hospital?
4         A.    She was upset prior to us telling
5    her, yes.  The medicals will agree with
6    the -- that she met the criteria to take her
7    to the hospital.
8         Q.    Did you discuss that with the
9    technician?
10        A.    Yes.
11        Q.    Was that name Field?
12        A.    Yes.
13        Q.    Had you ever been on assignment
14    together with him in the past?
15        A.    Yeah.
16        Q.    Tell me the conversation between
17    you and the AMT concerning being transported
18    the hospital.
19        A.    I could tell you that we went
20    over the details of the event.
21        Q.    And who was the one that actually
22    called for the ambulance, you or Officer
23    Stassi?
24        A.    I don't recall.
25        Q.    And at some point in time did the

Page 76

1                      MONIQUE AMODEO

2    ambulance arrive?

3         A.      Yes.

4         Q.      And that was AMT Field?

5         A.      Yes.

6         Q.      Was there anyone else in the

7    ambulance or only him?

8         A.      He was solo.

9         Q.      Were any other police officers

10   that appeared at the residence that day while

11   you were there?

12        A.      No.

13        Q.      What happened when the AMT

14   arrived?

15                MS. BEN-SOREK:  Objection to

16         form.  You can answer.

17        A.      The AMT and Ms. McCarthy had a

18   conversation regarding her allergies,

19   medications, things of that nature.

20        Q.      Did the AMT take any vitals?

21        A.      I can't say for certain, but

22   probably.

23        Q.      Do you remember what the AMT said

24   to Ms. McCarthy and what Ms. McCarthy said to

25   the AMT, if anything?

Page 77

MONIQUE AMODEO

1

2       A.      I don't, no.

3       Q.      What, if anything, did the AMT do

4   in furtherance of Ms. McCarthy leaving the

5   residence?

6       A.      What did he do?

7       Q.      Yes.  Did he escort her?

8       A.      We all walked out to the

9   ambulance together.

10       Q.      And she was placed in the

11   ambulance?

12       A.      Yes.

13       Q.      And did one of the police

14   officers go in the ambulance?

15       A.      I don't recall how we transported

16   her.

17       Q.      Well, doesn't somebody go in the

18   ambulance and somebody goes in the car?

19       A.      A police officer drives the

20   ambulance.

21       Q.      Drives the ambulance?

22       A.      Yes.

23       Q.      Do you remember who drove the

24   ambulance?

25       A.      I don't.

Page 78

1                      MONIQUE AMODEO

2          Q.      It was either you or Stassi,

3    right?

4          A.      Correct.

5          Q.      And either you or Stassi drove

6    the car?

7          A.      Correct.  Or the ambulance drove

8    us back.  I don't recall.

9          Q.      And you don't have any

10   recollection as to which of you drove?

11         A.      I don't recall.  It's like

12   whoever wants to drive, whatever.

13         Q.      You all went to Nassau University

14   Medical Center?

15         A.      Correct.

16         Q.      Now, getting back to the case

17   summary report, you should have that in front

18   of you, the first page indicates that it was

19   approved by Kenneth Catalani; do you see

20   that?

21         A.      Yes.

22         Q.      Is he a sergeant?

23         A.      Yes -- oh, no.  He's a

24   Lieutenant.

25         Q.      Did you ever speak to him about

1                    MONIQUE AMODEO

2    this incident?

3         A.      I don't recall.

4         Q.      Other than Officer Stassi and the

5    AMT, did you speak to anyone else employed by

6    the PD concerning this incident?

7         A.      Not that I recall.

8              MR. WOLIN:  Please mark this.

9              (Whereupon, at this time, the

10        above-mentioned Patient Care Report

11        was marked by the reporter as

12        Plaintiff's Exhibit 11, for

13        identification, as of this date.)

14        Q.      Exhibit 11, have you ever seen

15   that document before entitled Patient Care

16   Report?

17        A.      No.

18        Q.      Have you ever seen the form of

19   this document entitled Patient Care Report?

20        A.      I've never seen this before.

21        Q.      Do you know if this is a form

22   that is prepared by the AMT?

23        A.      Yes.

24        Q.      Now, I direct your attention to

25   the bottom portion of the first page, Bates,

1         MONIQUE AMODEO

2    11, it states here under the comments,

3    "Narrative:  Upon arrival found a

4    sixty-two-year old female with police stating

5    she told the school psychologist that she

6    wanted to kill herself.  Patient states she

7    said, 'My head hurts so bad I would not care

8    if I died'"; did you ever hear her make a

9    statement like that?

10        A.    I didn't hear that.

11        Q.    Now, I think in terms of your

12   evaluation, you believe that there's a

13   difference between a patient stating they

14   want to kill themselves and a patient stating

15   that my head hurts so bad I would not care if

16   I die?

17             MS. BEN-SOREK:  Objection.  You

18        can answer.

19        A.    What was that question?

20        Q.    In making your evaluation, do you

21   think that there's a difference between

22   someone saying I want to kill myself and

23   someone saying my head hurts so bad I would

24   not care if I die?

25        A.    It definitely furthers the claim.

Page 81

1          MONIQUE AMODEO

2      Q.      What furthers the claim?

3      A.      The fact that she didn't care if

4   she lived or died, because she was in pain.

5      Q.      So in your estimation anytime

6   someone makes a statement that I'm in such

7   pain I don't care if I die, that mandates

8   that they be sent to the medical center for

9   an evaluation; is that your testimony?

10      A.      I did not say that.

11      Q.      What, if any, training did you

12   receive in dealing with people who might be

13   mentally disabled?

14      A.      Whatever I received in the police

15   academy.

16      Q.      Can you describe what you

17   received?

18      A.      I can't remember twenty-three

19   years ago.

20      Q.      And when this incident occurred,

21   you had been in the academy approximately

22   twenty years before, right?

23      A.      Approximately.

24      Q.      Had you received any refresher

25   training in dealing with mentally disabled

Page 82

1                          MONIQUE AMODEO

2      people?

3            A.      Not to my knowledge.

4            Q.      Now, you indicated that you acted

5      pursuant to the Mental Hygiene Law?

6            A.      Yes.

7            Q.      Had you ever had any training in

8      what the Mental Hygiene Law says?

9            A.      I'm sure we did in the academy.

10           Q.      How about after the academy?

11           A.      I don't know specifically.

12           Q.      From the time you left the

13     academy until May of 2014, had you received

14     any instruction whatsoever on the Mental

15     Hygiene Law?

16                   MS. BEN-SOREK:  Asked and

17                answered.  You can answer.

18           A.      In the police academy.

19           Q.      I said after you left the police

20     academy?

21           A.      After I left the police academy?

22           Q.      Yes.

23           A.      No further training, to my

24     knowledge.

25           Q.      Have you ever looked at the

Page 83

1                    MONIQUE AMODEO

2    Mental Hygiene Law?

3         A.       If they gave it to us.  I don't

4    recall.

5         Q.       That would have been in the

6    academy?

7         A.       Yes.

8         Q.       Prior to this incident on May 28,

9    2014, had you ever before gone on a call

10   involving an alleged mentally disabled

11   person?

12        A.       Yes.

13        Q.       How many times?

14        A.       I don't know.

15        Q.       When had been the last time

16   before May 28th.

17        A.       I don't know.

18        Q.       Are you familiar with Department

19   Procedure OPS-1155?

20        A.       Not off the top of my head I'm

21   not.

22                 MR. WOLIN:  Why don't we mark

23        this?

24                 (Whereupon, at this time, the

25        above-mentioned department procedure

Page 84

1                      MONIQUE AMODEO

2           was marked by the reporter as

3           Plaintiff's Exhibit 12, for

4           identification, as of this date.)

5                MS. BEN-SOREK:  Please note I

6           will object to questions specifically

7           on policy and practice, except to the

8           extent that the witness is a fact

9           witness from her own experience or

10          recollection, because she's only a

11          fact witness, not an expert witness.

12                MR. WOLIN:  Of course.

13      Q.      I show you what we have marked as

14   Exhibit 12; have you ever seen this document

15   before?

16      A.      Not off the top of my head.

17      Q.      Is it your testimony that the

18   decision that was made to transport Ms.

19   McCarthy to the medical center on May 28th

20   was based upon what you had learned in the

21   academy about twenty years before?

22      A.      Yes.

23      Q.      Are you aware of something called

24   the Mobile crisis outreach team MCOT, have

25   you ever heard of that?

Page 85

1                      MONIQUE AMODEO

2        A.       I've heard of them.

3        Q.       Had you heard of them in May

4    2014?

5        A.       I've heard of them.

6        Q.       Had you heard of them by the time

7    you went to Ms. McCarthy's sister's house?

8        A.       Yes.

9        Q.       Did you ever consider calling

10   someone from the Mobile Crisis Outreach Team?

11       A.       No.

12       Q.       Do you know if that possibility

13   was ever discussed with Officer Stassi?

14       A.       I never discussed it with him.

15       Q.       On May 28th, 2014, did you know

16   that you could call the Mobile Crisis

17   Outreach Team who would then respond to the

18   location?

19       A.       If she did not meet the Mental

20   Hygiene Law.  She met the Mental Hygiene Law,

21   as far as I was concerned.

22       Q.       Why in your opinion did she meet

23   the Mental Hygiene Law.

24              MS. BEN-SOREK:  Objection.

25         Asked and answered.  You can answer.

Page 86

1                    MONIQUE AMODEO

2        A.      For the multiple reasons I had

3   given you earlier.

4        Q.      Now, is it your testimony that

5   when you arrived at the scene and you first

6   encountered Ms. McCarthy, that she was

7   conducting herself in a manner which was

8   likely to result in serious harm to herself

9   or others?

10                  MS. BEN-SOREK:  Objection.

11          Asked and answered.  You can answer.

12       A.      Say that one more time.

13       Q.      Yes.  When you arrived at the

14  scene and first encountered Ms. McCarthy, did

15  you believe that she was conducting herself

16  in a manner which was likely to result in

17  serious harm to herself or others?

18       A.      When we first engaged with or

19  when we first observed?  When we observed

20  her, we were just looking at her, so she

21  seemed calm.  Once we engaged her she was --

22  her emotional state changed.

23       Q.      Did you believe that the manner

24  in which she conducting herself was likely to

25  result in serious harm to herself?

Page 87

1                    MONIQUE AMODEO

2        A.      After conversation with her?

3        Q.      Yes.

4        A.      Yes.   Under the Mental Hygiene

5   Law, yes.

6        Q.      You believe it was likely?

7        A.      Yes.

8        Q.      Now, whether you drove the

9   ambulance or the patrol car, you arrived at

10  the hospital, right?

11       A.      Yes.

12       Q.      And what happened when you

13  arrived at the hospital?

14       A.      She went to triage and then she

15  went down to Area 4 or wherever it was at

16  that time, they switched it.

17       Q.      Were you with her when she went

18  to triage or Area 4?

19       A.      We all were there.

20       Q.      And what did you observe, what

21  happened?

22       A.      I don't understand the question.

23       Q.      What happened?

24       A.      The triage, they took her

25  pedigree information and they took her blood

1                    MONIQUE AMODEO

2    pressure, probably her temperature, waited

3    for her wrist band.  When she got her

4    wristband, we took her down to Area 4 where

5    the psych ward is or whatever the psych ward

6    was at the time.

7          Q.      Did you speak to anybody?

8          A.      I did not.

9          Q.      Did Officer Stassi speak to

10   anybody?

11         A.      Not that I recall.  Normally the

12   AMT speaks to the --

13         Q.      That was my next question.  Do

14   you know if AMT spoke to anybody?

15         A.      Normally it's his job to inform

16   the triage nurses.

17         Q.      Did you overhear the

18   conversation?

19         A.      I don't know.

20         Q.      How long did you remain in the

21   hospital?

22         A.      I don't know.  It's a process.

23   It depends on where she was when we got in,

24   how many people were before us to get

25   triaged.  Then how long it took her to get

Page 89

MONIQUE AMODEO

1
2    triaged.  Then to take her to Area 4, then we
3    have to be dismissed by security down there.
4    First they have to warrant her, we have to
5    fill out paperwork.  I don't know how long
6    that process took.
7        Q.    I think your memo book says you
8    signed off the job at 1600?
9        A.    We went 101 and we back in
10   service at 1600.
11       Q.    Does that mean you left the
12   hospital at 1600?
13       A.    No.  It doesn't mean that.  It
14   means we go back in service usually once the
15   case report is called in.  I don't know where
16   we went back in service at the time.
17            MR. WOLIN:  I want to show you a
18            couple of more documents and I will
19            basically be done.  Mark this.
20            (Whereupon, at this time, the
21            above-mentioned event search report
22            was marked by the reporter as
23            Plaintiff's Exhibit 13, for
24            identification, as of this date.)
25       Q.    I show you what was marked as

Page 90

1                    MONIQUE AMODEO

2    Exhibit 13, it's an event search; have you

3    seen this document before?

4         A.    No.

5         Q.    What is the document entitled

6    Event Search, if you know?

7         A.    I never saw it before.

8         Q.    But do you know what an event

9    search document is, without having seen this

10   particular document?

11        A.    I could do an event search on the

12   computer.  It's a different computer, so I

13   haven't seen it like this.

14        Q.    What's the different between 139

15   and 139-B?

16             MS. BEN-SOREK:  If you know.

17        A.    I don't know.  B is usually the

18   tour.  That's a day tour.

19        Q.    So B reflects the tour?

20        A.    Yes.

21        Q.    Now, on the second page there's a

22   reference to other units, do you see that,

23   2358?

24        A.    Okay.

25        Q.    2377?

Page 91

1                    MONIQUE AMODEO

2        A.      Okay.

3        Q.      Do you know what those references

4    are about?

5        A.      Those are buses, ambulances.

6        Q.      So why does it have two

7    ambulances?

8        A.      Well, one might have been

9    assigned and then when 58, it looks like it's

10   a spare ambulance maybe, I don't -- the last

11   number is the precinct normally that they're

12   assigned to.  So one would be the 7th, one

13   would be the 8th.  One might have been closer

14   and gave the other one a disregard.  I have

15   no idea just by this paperwork.

16               MR. WOLIN:  Please mark this.

17               (Whereupon, at this time, the

18          above-mentioned Event log was marked

19          by the reporter as Plaintiff's

20          Exhibit 14, for identification, as of

21          this date.)

22       Q.      I show you what we just marked as

23   Exhibit 14, entitled Background Event

24   Chronology; do you know what that document

25   is?

Page 92

1               MONIQUE AMODEO

2       A.      No.

3       Q.      What?

4       A.      No.

5       Q.      Do you know who makes this
6  document?

7       A.      No.

8       Q.      Do you see where it says, "Term,"
9  it says, it looks like DISP-01?

10      A.      Dispatcher 1.

11      Q.      And what is CAD; is that the CAD
12  system?

13      A.      Cad system.

14      Q.      Then the 2377 is the bus?

15      A.      Yep.

16      Q.      So when it says Dispatcher 1
17  dispatcher 7, is that just the identity of
18  the dispatcher?

19      A.      It's the precinct where the
20  dispatcher works and I believe it's the 1st
21  Precinct, 7th Precinct.  So the 7th precinct
22  dispatched the 77 bus.

23      Q.      What does LOI mean?

24      A.      LOI?  I don't see where it is.
25  Point it out.

1                    MONIQUE AMODEO

2          Q.      Four lines down.

3          A.      Oh.   Location of incident?   I

4     don't know.

5                    MR. WOLIN:   One more document.

6                    (Whereupon, at this time, the

7               above-mentioned Unit information was

8               marked by the reporter as Plaintiff's

9               Exhibit 15, for identification, as of

10              this date.)

11         Q.      I show what we marked as Exhibit

12    15, entitled, "Unit Information"; have you

13    ever seen that document before?

14         A.      Never.

15         Q.      Do you know what the purpose of a

16    document entitled Unit Information is?

17         A.      No.

18                   MS. BEN-SOREK:   Objection.   You

19              can answer.

20         Q.      Do you know who puts the

21    information on this document?

22         A.      No.

23         Q.      You see where it say S-T under

24    initials?

25         A.      S-T?

Page 94

1            MONIQUE AMODEO

2       Q.      The second column from the left?

3       A.      ST?  Oh.  Okay.  What's the
4  question?

5       Q.      What do those initial signified?

6       A.      I don't know.

7       Q.      There are numbers under
8  employees, do you see that?  There's a
9  905540, 905584; do you see that?

10       A.      I see that.

11       Q.      Do you know what that is a
12  reference to?

13       A.      I don't.

14       Q.      I may have asked you this
15  question, if I have, I apologize.

16              Once you got to the hospital, did
17  you have any conversations with anybody?

18       A.      No.

19              MR. WOLIN:  I have no further
20          questions.

21              MR. SMITH:  I have a few.  I
22          will be brief, I promise.

23  EXAMINATION BY

24  MR. SMITH:

25       Q.      At in point that day, did you

MONIQUE AMODEO

1
2    ever tell Ms. McCarthy that, in sum and
3    substance, you didn't think there was any
4    reason that you should have been called that
5    day?
6         A.    No.
7         Q.    Did you ever tell Ms. McCarthy
8    that someone at the district was obviously
9    out to get her, because they had called you?
10        A.    No?
11        Q.    Did you ever tell Ms. McCarthy
12   that you believed she should sue the district
13   for having called the police that day?
14        A.    No.
15        Q.    Did you ever hear anyone else
16   make such comments to Ms. McCarthy that day?
17        A.    No.
18        Q.    Now, you have already gone
19   through the basis for why you believed you
20   needed to evaluate Ms. McCarthy
21   independently.  After you had made that
22   determination that you needed to evaluate,
23   you and your partner needed to evaluate Ms.
24   McCarthy, was there anything anyone at the
25   district could have told you at that point to

1                    MONIQUE AMODEO
2    have changed your mind?
3                   MR. WOLIN:  Objection.
4                   MS. BEN-SOREK:  You can answer.
5        A.    No.  What they told us and what
6    we saw and heard together made the
7    determination.
8        Q.      But the determination was based
9    in part upon what you personally observed
10   when you arrived at the house, correct?
11       A.      Yes.
12                  MR. SMITH:  I have nothing else.
13                  MR. WOLIN:  Thank you.
14                   (Whereupon, at 3:44 p.m.
15                  these proceedings were
16                  concluded.)
17
18           - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                     MONIQUE AMODEO
19
     Subscribed and sworn to
20
     before me on this _____day
21
     of _____, 2016.
22
23   _____
                   NOTARY PUBLIC
24
25

Page 97

1

2                              I N D E X

3    WITNESS              EXAMINATION BY       PAGE    LINE

4    M.  AMODEO           MR.  WOLIN             5      19

                          MR.  SMITH           94      25

5

     REQUESTS                                  PAGE    LINE

6

     Provide  requested  documentation         12       2

7

     Provide  requested  documentation         49      25

8

9              INDEX  TO  PLAINTIFF'S  EXHIBITS

10   EXHIBIT          DESCRIPTION        PAGE    LINE

11   9                Memo  book          24      7

12   10               Case  report        60      22

13   11               Patient Care Report 9       14

14   12               Police  procedure  84       5

15   13               Event Search Report 9       25

16   14               Event  log          91      22

17   15               Unit  information   93      11

18

19

20

21

22

23

24

25

Page 98

1

2                        CERTIFICATION

3

4           I, RAYMOND P. STALKER, a notary public in and

5      for the State of New York, do hereby certify:

6           THAT the witness whose testimony is hereby

7      before set forth, was duly sworn by me; and

8      that the within transcript is a true record of the

9      testimony given by said witness.  I further certify

10     that I am not related, either by blood or marriage,

11     to any of the parties to this action; and

12          THAT I am in no way interested in the outcome

13     of this matter.

14          IN witness whereof, I have hereunto set my

15     hand this 20th day of May, 2016.

16

17

18          _____

                RAYMOND P. STALKER

19

20

21

22

23

24

25

Page 99

1

2                       ERRATA SHEET

              VERITEXT/NEW YORK REPORTING, LLC
3                       1-800-727-6376

4    330 Old Country Road,    1250 Broadway

     Mineola New York         New York, New York
5

6    Name of Case: McCARTHY v ROOSEVELT, ET AL

     Date of Deposition:  5/12/16
7    Name of DEPONENT:  MONIQUE AMODEO

8    PAGE LINE            CHANGE              REASON

9    --- ---   ------------------------   ---------

10   --- ---   ------------------------   ---------

11   --- ---   ------------------------   ---------

12   --- ---   ------------------------   ---------

13   --- ---   ------------------------   ---------

14   --- ---   ------------------------   ---------

15   --- ---   ------------------------   ---------

16   --- ---   ------------------------   ---------

17   --- ---   ------------------------   ---------

18   --- ---   ------------------------   ---------

19   --- ---   ------------------------   ---------

20                        _____

                         MONIQUE AMODEO
21

22   SUBSCRIBED AND SWORN TO BEFORE

23   ME THIS ___DAY OF_____, 2016.

24   _____      _____

     NOTARY PUBLIC            COMMISSION EXPIRES
25

[& - answer]

| & |
|---|
| **&** 3:3,7 |

| 0 |
|---|
| **01** 92:9 |
| **0700** 17:24 23:18 |

| 1 |
|---|
| **1** 92:10,16 |
| **1-10** 1:9 |
| **1-800-727-6376** 99:3 |
| **10** 60:20 97:12 |
| **101** 89:9 |
| **10601** 3:10 |
| **107** 51:16 |
| **1080** 50:23,24 |
| **10:45** 62:4,5 |
| **11** 79:12,14 80:2 97:13,17 |
| **11-20** 1:15 |
| **11501** 3:15 5:25 |
| **1155** 83:19 |
| **11753** 3:4 |
| **12** 1:20 84:3,14 97:6 97:14 |
| **1250** 99:4 |
| **13** 89:23 90:2 97:15 |
| **1337** 26:22 62:18 |
| **1351** 38:24 |
| **1357** 38:19,21 |
| **139** 15:5,7 90:14,15 |
| **14** 91:20,23 97:13 97:16 |
| **1490** 5:24 |
| **15** 93:9,12 97:17 |
| **1600** 51:13,19 89:8 89:10,12 |
| **1700** 17:24 23:18 |
| **19** 97:4 |
| **1st** 92:20 |

| 2 |
|---|
| **2** 97:6 |
| **20124** 21:12 |
| **2014** 9:17,22 10:5 10:17 12:19,24 13:4 |

13:25 14:13 15:2,10
15:22 16:6,10,15,20
17:2,12,18,22 18:6
18:14,18 20:4,7,19
21:11,25 22:19 23:5
23:10,10 26:11,14
27:8 82:13 83:9
85:4,15
**2016** 1:20 96:21
98:15 99:23
**20th** 98:15
**22** 13:21 97:12,16
**233** 51:3
**2358** 90:23
**2377** 90:25 92:14
**23rd** 13:16
**24** 97:11
**240** 1:18
**25** 97:4,7,15
**28** 21:25 22:19 23:4
23:10,10 83:8
**28th** 9:17,22 10:4,17
12:19,24 13:4 17:22
21:12 26:11,14 27:8
28:13 83:16 84:19
85:15
**2:11** 1:20

| 3 |
|---|
| **318938** 51:15 |
| **330** 99:4 |
| **3:44** 96:14 |

| 4 |
|---|
| **4** 87:15,18 88:4 89:2 |
| **420** 3:4 |
| **445** 3:9 |
| **49** 97:7 |

| 5 |
|---|
| **5** 97:4,14 |
| **5/12/16** 99:6 |
| **51** 38:15 |
| **58** 91:9 |

| 6 |
|---|
| **60** 97:12 |

| 7 |
|---|
| **7** 92:17 97:11 |
| **77** 92:22 |
| **7th** 91:12 92:21,21 |

| 8 |
|---|
| **8** 41:23 |
| **84** 97:14 |
| **8th** 91:13 |

| 9 |
|---|
| **9** 24:5 25:15 97:11 97:13,15 |
| **9/9/2014** 61:22 |
| **905540** 94:9 |
| **905584** 94:9 |
| **91** 97:16 |
| **913** 17:17 |
| **93** 97:17 |
| **94** 97:4 |

| a |
|---|
| **abuse** 21:9,10 |
| **academy** 13:21 81:15,21 82:9,10,13 82:18,20,21 83:6 84:21 |
| **acted** 82:4 |
| **action** 14:16 98:11 |
| **actions** 46:8 |
| **actual** 29:22 |
| **address** 5:23 45:18 45:24 |
| **advisement** 12:8 |
| **afternoon** 5:6 |
| **ago** 9:3 10:10,12 81:19 |
| **agree** 32:9 75:5 |
| **agreed** 4:5,9,12 |
| **aided** 21:20 22:2 |
| **al** 99:6 |
| **alan** 3:5 5:7 |
| **allegations** 9:5 |

**alleged** 49:4 83:10
**allergies** 76:18
**allowed** 53:23 54:2
**ambulance** 65:12,15
68:17,23 71:10 72:4
72:13 74:14 75:22
76:2,7 77:9,11,14
77:18,20,21,24 78:7
87:9 91:10
**ambulances** 91:5,7
**amodeo** 1:12,23 2:5
3:14 5:1,21 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1,18 97:4 99:7
99:20
**amt** 75:17 76:4,13
76:17,20,23,25 77:3
79:5,22 88:12,14
**answer** 13:6,9 17:14
19:22,23 20:15 21:8
21:23 28:5 62:4
66:22,25 67:2 68:10
68:19 69:24 74:2
76:16 80:18 82:17

[answer - care]

85:25 86:11 93:19 96:4
**answered** 28:15 30:9,15 54:24 56:17 68:10 82:17 85:25 86:11
**anybody** 40:14 48:12 55:5 88:7,10 88:14 94:17
**anymore** 64:20
**anyplace** 69:6 71:22
**anytime** 81:5
**apologize** 94:15
**appear** 64:3
**appearance** 63:16 63:18
**appeared** 76:10
**appropriate** 70:22 70:23
**approved** 78:19
**approximate** 18:12 20:9 22:17 52:13 60:12
**approximately** 10:11,13 18:20 20:24 23:22 26:25 35:11 81:21,23
**approximation** 18:22 35:19,20
**area** 16:16 87:15,18 88:4 89:2
**arising** 24:13
**arm** 74:4
**arrival** 29:22 60:8 80:3
**arrive** 26:13 27:2,4 76:2
**arrived** 26:16 32:7 36:7,23 42:7 53:12 54:19,22 62:21 65:19 68:4 76:14 86:5,13 87:9,13 96:10
**ascertain** 9:17

**asked** 45:19 68:9 82:16 85:25 86:11 94:14
**asking** 5:10 70:20
**assessment** 67:14
**assigned** 13:19 14:4 14:21,23 15:3 16:21 16:24 91:9,12
**assignment** 14:2,10 14:15,19 15:21 20:3 20:13,16,17 51:14 51:19 75:13
**assignments** 17:4 26:2
**assist** 74:13
**assistant** 22:20 27:10 47:19
**associates** 3:7
**assume** 17:18 43:17 45:15 46:6
**attempt** 5:15
**attention** 23:9 41:25 79:24
**attorney** 5:8 6:9,12 7:12,17 12:6
**attorney's** 3:12 7:7 7:10
**attorneys** 3:3,7,13
**avenue** 3:9 5:25
**aware** 46:7 84:23

**b**

**b** 90:15,17,19
**back** 15:19 43:8 67:7 78:8,16 89:9 89:14,16
**background** 91:23
**bad** 80:7,15,23
**badge** 45:17
**band** 88:3
**base** 63:14
**based** 37:20 39:2 54:11 63:22 66:7 84:20 96:8

**basically** 13:23 59:21 89:19
**basis** 25:11 37:9 52:17 95:19
**bates** 79:25
**belief** 35:16 54:6,12
**believe** 7:21 9:13 10:25 11:16 15:5 22:13 32:3,21,23 37:10,12,19 39:17 39:25 41:15,19 44:5 45:2 47:20 48:13 51:13 52:25 54:23 57:9,19 59:11 62:3 73:10 80:12 86:15 86:23 87:6 92:20
**believed** 95:12,19
**bell** 56:16
**ben** 3:16 6:17 7:13 7:20 12:7,11 13:5,8 17:13 19:17,21 20:14 21:6 25:9 29:17 41:12 50:2,6 52:16,23 66:21 67:2 68:9,18 69:23 70:14 71:24 72:25 73:25 76:15 80:17 82:16 84:5 85:24 86:10 90:16 93:18 96:4
**beno** 46:20 47:8
**best** 5:16 30:20 36:22 39:13
**better** 50:9
**big** 69:4
**birth** 45:19,24
**blood** 87:25 98:10
**bodily** 74:16
**book** 23:23 24:3 25:18,20,25 26:4,7 35:15 49:16 50:12 89:7 97:11
**bottom** 73:2 79:25
**braswell** 1:7 3:8 23:4 32:11,17 34:2 37:6,8,13,15,21,25

38:4 39:23,24 40:6 40:25 41:5 48:10 55:22 56:3 64:18,19
**break** 12:5 42:15
**brief** 42:16 94:22
**broadway** 99:4
**bruckbauer** 19:12 19:14 20:2
**building** 33:15
**bureau** 7:23 20:18
**bus** 68:13,14 92:14 92:22
**buses** 91:5
**business** 5:22

**c**

**c** 3:2
**cad** 92:11,11,13
**call** 7:17 12:2 27:9 27:18 29:9 30:8,15 30:18 31:7,19 58:22 67:12 68:22 72:12 83:9 85:16
**called** 26:23 30:6,12 33:9 35:10 36:10,14 42:6 55:3,6 61:20 71:10 72:5 75:22 84:23 89:15 95:4,9 95:13
**calling** 29:12 33:21 68:17 85:9
**calls** 17:7 21:24
**calm** 34:24,25 63:6 63:11 64:9 86:21
**calmed** 45:12
**calmer** 36:19
**capable** 59:6,11
**capacity** 1:7,8,9,12 1:13,14
**car** 14:24 15:3,5,8 29:25 31:4 77:18 78:6 87:9
**care** 79:10,15,19 80:7,15,24 81:3,7 97:13

[case - details]

case 9:23 10:4,24
12:15,19,24 13:4
22:2 24:10,13 45:24
47:2,4 51:14 53:8
60:14,18 61:2,4
66:16 67:12 78:16
89:15 97:12 99:6
cases 21:21 24:24,25
catalani 78:19
cause 67:22
cell 27:23,24 28:2,3
28:3,5,8 30:12 48:4
center 54:9 65:17,19
66:4,9 67:23 78:14
81:8 84:19
certain 41:16 43:14
50:14 76:21
certification 4:7
98:2
certify 98:5,9
change 73:11 99:8
changed 69:9 86:22
96:2
check 23:23 48:3
50:2,7
checked 45:10
child 21:9,9
chronology 91:24
circumstances 5:12
8:16 9:19,23 10:4
10:16,24 11:8 12:15
12:18,23 13:3 22:6
citing 44:12,13
civil 2:8
civilian 61:11
claim 7:14 71:18
80:25 81:2
clarify 7:21
clear 37:5 51:13
clearly 32:18 59:6
69:7
client 7:12 12:6
close 52:15
closer 91:13

clyde 1:7 3:8
collectively 55:14,17
column 94:2
combination 57:20
come 8:21 27:7 57:5
65:13 70:4,12,18
comfortable 67:9
coming 69:21
command 13:17
commanding 7:8
comments 80:2
95:16
commission 99:24
communicate 9:25
communicated
12:21
computer 90:12,12
concerned 85:21
concerning 5:11
6:12 10:3 12:14,18
13:3 14:13 38:4
40:8 44:20 46:13
53:15 75:17 79:6
concluded 96:16
conduct 21:14
conducting 86:7,15
86:24
confer 72:3
confirmed 37:6
47:18,23 54:15 67:7
71:21
consequence 46:8
consider 85:9
considerably 36:19
consisted 15:19
contact 27:15 45:17
45:23 72:15,17,19
73:3,23 74:17
contacted 72:22
contained 66:16
69:5
continuously 18:6
conversation 29:4
33:7,22 39:13 40:24
41:6,9,14,18 53:14

55:15 58:3 64:14
69:13 75:16 76:18
87:2 88:18
conversations 40:19
94:17
convicted 25:7,13
copier 49:21
copy 38:12,16 49:22
50:3,7
correct 11:12,13
15:15 16:18,19
17:20 24:10 30:2,4
30:14,16,18,19
32:17 36:7,8,24,25
39:3 41:6 47:14
48:14,18,19 51:4,9
51:17,20 52:9 53:4
53:9,12 54:20 56:14
56:18 64:4 67:19
69:8 71:6,20,23
73:3,4 78:4,7,15
96:10
counsel 4:6 7:20 8:6
10:14
country 99:4
county 1:11,11,14
3:12,13,13 6:8,11
7:10,17 13:13,15
23:14 24:14
couple 24:8 89:18
course 15:17 20:23
71:4 84:12
court 1:2 4:15
crime 25:8,13
criminal 24:24,25
crisis 84:24 85:10,16
criteria 65:23 75:6
crying 63:8,10
current 13:17 18:25
20:17
currently 13:11

| d |
| --- |
| d 5:2 97:2 |

daily 25:21
data 61:8,10,10
date 6:13 9:2,15,24
18:11 24:6 45:18,24
60:21 61:21 79:13
84:4 89:24 91:21
93:10 99:6
dates 7:18,19
day 9:11,12 10:9
14:20 15:18 17:23
20:11 23:11,13,17
23:19 25:22 32:20
33:21,23 38:3 39:16
39:17,21,24 40:4
42:6 46:13 76:10
90:18 94:25 95:5,13
95:16 96:20 98:15
99:23
dealing 81:12,25
deborah 1:6 3:8
decision 48:16,20,22
72:12 84:18
defendant 5:2 24:9
24:12
defendants 1:17 2:6
2:7 3:7,13
definitely 80:25
demeanor 62:23
63:5 68:24 69:9
denton 1:18
department 1:11
3:13 7:22 13:13,15
14:9 83:18,25
depends 88:23
deponent 99:7
deposition 2:5 4:8
4:13 6:3,6,12,15,22
8:3,6,12 25:4 41:22
99:6
describe 17:10
62:22 63:4 81:16
description 97:10
detail 33:8
details 28:22 32:4
75:20

[determination - flashing]

determination 95:22 96:7,8
determining 68:22 71:9
dictate 61:16
dictated 61:13,18
die 80:16,24 81:7
died 80:8 81:4
difference 68:2,3 80:13,21
different 90:12,14
direct 23:9 41:25 79:24
directed 29:9
directly 30:15
disabled 81:13,25 83:10
discuss 75:8
discussed 85:13,14
discussing 53:19,21
discussion 48:6
dismissed 89:3
disp 92:9
dispatched 92:22
dispatcher 92:10,16 92:17,18,20
display 71:2,5
displeased 60:3
disregard 91:14
distraught 58:25
district 1:2,2,6,9 3:8 7:7 14:5,9,14,22 15:13,24 16:13,17 16:22,25 17:5 18:2 18:5,10,19 21:17 64:17 65:5 66:2 95:8,12,25
document 60:22 79:15,19 84:14 90:3 90:5,9,10 91:24 92:6 93:5,13,16,21
documentation 97:6 97:7
documents 6:14,21 8:2 89:18

doe 1:9,10,15,15
doing 25:5 36:11,14 64:15
door 54:23,24 56:15
drive 27:6 49:17 50:14,19 51:3 78:12
drives 77:19,21
driving 31:4
drove 77:23 78:5,7 78:10 87:8
duly 5:3 98:7
duties 17:2 20:24 24:13 26:3

**e**

e 3:2,2,5 5:2,2 10:3 13:2 97:2
earlier 33:21 35:9 35:11,17 86:3
eastern 1:2
edith 1:8 3:9 22:21
effect 4:14 28:19 64:24
eight 8:19 20:10,11
eighteen 10:9
either 64:22 73:10 78:2,5 98:10
elementary 20:20 21:13
embarrassed 64:22
emergency 52:22 53:2
emotional 47:22 60:4 86:22
emotionally 33:13 44:8 58:25
employed 13:12,14 79:5
employees 1:9,14 94:8
en 50:13,18,25 53:16
encounter 58:11
encountered 86:6 86:14

engaged 58:2 86:18 86:21
entered 63:4
entire 13:23 42:21 42:24 43:3,5 58:11
entitled 79:15,19 90:5 91:23 93:12,16
entries 51:10
entry 51:8
errata 99:2
escort 77:7
escorted 73:12,18
escorting 73:24 74:6
esq 3:5,11,16
establish 65:22
estimation 81:5
et 99:6
eval 44:24
evaluate 95:20,22 95:23
evaluated 68:13
evaluation 54:5,9 60:3 66:8 68:16 80:12,20 81:9
event 32:5 75:20 89:21 90:2,6,8,11 91:18,23 97:15,16
events 32:19 34:2 37:4
everybody 59:17
exact 9:2 35:9 54:15 62:15,16
exactly 50:16
examination 5:17 94:23 97:3
examined 5:4
excerpt 26:9 50:11
excerpts 25:17
excited 33:13 60:5 64:11 65:11
excuse 55:19
exhibit 24:5 25:15 41:23 60:20 79:12 79:14 84:3,14 89:23 90:2 91:20,23 93:9

93:11 97:10
exhibits 97:9
experience 84:9
expert 84:11
expires 99:24
extent 84:8
eyewitnesses 54:14

**f**

facilities 15:20
facility 21:16
fact 56:9 59:9 66:20 66:24 67:4 69:2 70:3 71:18 81:3 84:8,11
factor 68:15,21
facts 5:11 8:15 9:18 9:22 10:3,15,23 11:8 12:15,18,23 13:3
fair 18:17
familiar 8:8 20:20 43:24 83:18
far 30:3 85:21
fault 70:2
federal 2:7
feel 67:21
felt 64:21
female 80:4
fictitious 1:10,15
field 1:13 3:14 75:11 76:4
figure 35:14 65:23
fill 89:5
finish 41:12 70:15
finished 30:25
first 5:3 13:18,20 14:2 18:8 32:7,22 36:23 52:5,7 58:2 62:21 63:3 64:8,9 78:18 79:25 86:5,14 86:18,19 89:4
five 18:13,14
flashing 52:24

**[floor - investigation]**

floor 57:14,15
follow 12:12 48:23
  48:24,25
follows 5:5
force 4:14
form 4:10 10:2 21:7
  35:16 74:2 76:16
  79:18,21
forth 15:19 98:7
forwarded 7:23
found 80:3
four 18:20 49:5
  54:14,16 55:13,19
  93:2
fourteen 38:25 39:4
  39:8
frame 26:24 35:24
franklin 5:25
free 1:6,9 3:8 16:17
  16:25 18:5,9,19
  59:7,12
freeport 50:19 51:3
  52:7
friend 46:15 48:10
friendly 57:6
friends 47:21
front 78:17
full 5:19 14:10
  56:20
furnish 7:16
further 4:9,12 82:23
  94:19 98:9
furtherance 77:4
furthers 80:25 81:2

**g**

gauge 64:15
generalization
  59:21
generally 58:17
gerald 3:11
getting 69:14 78:16
give 45:16
given 25:4 28:10
  86:3 98:9

go 20:25 21:5 28:20
  31:9 43:8,19,20
  48:16 55:8 65:19,22
  73:13 77:14,17
  89:14
goes 7:22 42:4 77:18
going 5:9 15:19 42:2
  46:8 54:17 55:8,24
  56:4,7,10 67:13
  74:20 75:2
good 5:6 18:21
gotten 15:4
grab 73:11
graduated 13:21
greeted 32:3,10
grounds 7:11
guess 52:16
guessing 39:21

**h**

hair 63:20
half 8:20 9:3 10:12
  20:11
hamilton 3:9
hand 26:17 74:5
  98:15
handcuffed 73:14
handed 10:25 11:6
handled 17:4
happen 45:20,22
  64:21
happened 9:19
  31:25 54:22 57:8
  62:12 71:2,5 76:13
  87:12,21,23
happening 40:19
harm 86:8,17,25
head 35:14 80:7,15
  80:23 83:20 84:16
headquarters 5:24
hear 44:25 61:16
  80:8,10 95:15
heard 37:10,13,15
  84:25 85:2,3,5,6
  96:6

held 2:8 48:6
hereto 4:6
hereunto 98:14
higgins 1:8 3:9
  22:21 27:11,15 28:7
  28:17 29:24 30:21
  31:2,8 32:3,8,14,16
  32:22,24 33:2,6,23
  34:5 36:9,24 39:10
  39:16 40:7 41:8,14
  44:25 48:9 55:22,23
high 74:13
home 43:19 54:7
  67:9
horrible 49:22,22
hospital 68:6 73:8
  73:10 74:20 75:3,7
  75:18 87:10,13
  88:21 89:12 94:16
hour 62:12
house 34:21 43:20
  45:11 53:16 55:25
  56:4,7,10,12 57:15
  60:8 62:22 63:4
  69:22 85:7 96:10
hows 27:18
huh 25:16
hurt 71:19
hurts 80:7,15,23
hygiene 22:11 43:24
  44:9,12,16,20 53:20
  53:22 54:2 59:22,24
  82:5,8,15 83:2
  85:20,20,23 87:4
hysterical 33:12

**i**

idea 11:20,24 55:5
  91:15
identification 24:5
  60:20 79:13 84:4
  89:24 91:20 93:9
identify 29:11 34:11
  56:19

identity 92:17
immediate 17:19
immediately 35:3
important 66:20,23
  67:4
inappropriate 69:20
  70:10,17
incident 9:16 28:21
  28:24 31:12,15,17
  40:2,9 41:23 46:16
  62:11 64:6 79:2,6
  81:20 83:8 93:3
including 10:2
  21:20 45:18
independent 39:2
  67:14
independently
  95:21
index 97:9
indicate 46:23 47:4
indicated 16:3 36:22
  39:22 82:4
indicates 78:18
individual 29:12
individually 1:6,7,8
  1:12,13,14
individuals 55:19
influence 67:20
inform 88:15
information 25:24
  45:17,23 61:4 87:25
  93:7,12,16,21 97:17
initial 94:5
initially 32:25 34:4
initials 93:24
inputted 61:3,5
instruction 82:14
intent 65:18 68:5
interacted 12:14
interaction 42:21
  68:7
interested 98:12
intersection 53:6
investigation 7:15
  50:20

[invited - messed]

**invited** 54:25
**involve** 21:25
**involving** 83:10

**j**

**jericho** 3:4,4
**job** 20:23 67:13
  88:15 89:8
**john** 1:9,10,15,15
**joseph** 1:11 3:14

**k**

**kenneth** 78:19
**kill** 33:12 37:7 49:2
  49:8,13 58:24 66:11
  69:3 71:19 80:6,14
  80:22
**knew** 31:15,16
  35:21,24 36:3,4
  55:19
**knock** 56:15
**know** 6:13 7:6 11:14
  11:19,22 15:4,8
  19:15,18,24 20:8,12
  22:20 24:22 26:15
  27:12,14,17 28:7
  31:13 34:14 35:8,15
  35:21 36:2,4 38:20
  39:19 40:17 41:3,15
  44:14,17,18 45:6,8
  46:4,21 52:3,4,12
  52:18 55:2,16 60:6
  62:13,15 65:5,9
  69:18 72:7,10 79:21
  82:11 83:14,17
  85:12,15 88:14,19
  88:22 89:5,15 90:6
  90:8,16,17 91:3,24
  92:5 93:4,15,20
  94:6,11
**knowing** 68:7
**knowledge** 25:6
  34:16,18 37:9 40:5
  72:16 82:3,24

**l**

**l** 1:6 3:8
**law** 22:11 43:24
  44:10,12,16,20
  53:20,22 54:3 59:22
  59:24 82:5,8,15
  83:2 85:20,20,23
  87:5
**lawsuit** 5:9,12 8:16
  9:6 10:16
**lead** 66:8
**learned** 84:20
**leave** 44:4,6 53:24
  54:2
**leaving** 67:9 77:4
**led** 68:17
**ledger** 25:21
**left** 10:9 20:10,11,12
  26:17 36:20 49:14
  50:15,17 51:21 55:7
  59:9 60:7 62:10,15
  62:17 82:12,19,21
  89:11 94:2
**legal** 7:22
**letter** 6:25 7:3,4,6,9
  7:16 8:2 9:10,14
  11:2,3,7,9,10,11,17
  11:19,23,25,25 12:3
**liaison** 14:8
**license** 45:20 46:2
**lieutenant** 78:24
**lights** 52:24 53:2
**line** 38:13,14,17
  49:18,20,24 73:2
  97:3,5,10 99:8
**lines** 93:2
**liora** 3:16
**little** 65:10 69:18
**lived** 81:4
**living** 57:19 58:3
**llc** 99:2
**location** 50:18 85:18
  93:3

**log** 91:18 97:16
**loi** 92:23,24
**long** 13:14,19 20:5
  31:21 38:10 51:25
  52:10,13 60:6 72:9
  88:20,25 89:5
**longer** 19:19
**look** 25:14 42:3
  49:15
**looked** 82:25
**looking** 86:20
**looks** 49:21 51:2
  91:9 92:9
**lot** 43:6

**m**

**m** 5:2,2 97:4
**mails** 10:3 13:2
**main** 32:2 57:10,14
  57:15
**maintain** 25:22 26:4
  26:6
**making** 30:8 80:20
**mandates** 81:7
**manner** 86:7,16,23
**margin** 26:17
**marine** 20:18
**mark** 23:24 60:16
  79:8 83:22 89:19
  91:16
**marked** 24:3 41:22
  60:19 79:11 84:2,13
  89:22,25 91:18,22
  93:8,11
**marriage** 98:10
**matter** 53:16 98:13
**matters** 24:23
**matthew** 1:13 3:14
**mccarthy** 1:3 5:9
  34:9,12,14,19,24
  35:18 36:10,14,18
  37:6,7,14,15 45:2
  45:11 46:15 48:2,10
  48:17 55:3 57:9,21
  58:11,15 59:19

  62:22 63:3 73:6
  76:17,24,24 77:4
  84:19 86:6,14 95:2
  95:7,11,16,20,24
  99:6
**mccarthy's** 54:24
  85:7
**mcot** 84:24
**meal** 51:15
**mean** 38:22 41:11
  50:24 51:18 59:4
  61:6 67:25 89:11,13
  92:23
**meaning** 62:8 63:19
  73:19
**means** 61:23,25
  89:14
**meant** 6:10
**medic** 1:13 3:14
**medical** 54:8 65:16
  65:19 66:4,9 67:23
  78:14 81:8 84:19
**medicals** 75:5
**medications** 76:19
**meet** 85:19,22
**meeting** 64:21
**meets** 44:9
**meltdown** 64:25
**memo** 23:23 24:3
  25:17,20,25 26:4,7
  49:15 50:11 89:7
  97:11
**mental** 22:11 43:23
  44:9,11,16,20 53:20
  53:22 54:2 59:22,23
  82:5,8,14 83:2
  85:19,20,23 87:4
**mentally** 81:13,25
  83:10
**mentioned** 2:8 16:2
  24:3 49:6 60:18
  71:11 79:10 83:25
  89:21 91:18 93:7
**messed** 63:19

| | | | |
|---|---|---|---|
| **met** 22:10,23,25 23:4 28:11 34:17 57:9 65:23 75:6 85:20 | **multiple** 23:2,8 86:2 | **o** | 76:9 77:14 |
| | **n** | **o** 5:2,2,2 | **official** 1:7,8,8,12,13 1:14 |
| **middle** 22:13 | **n** 3:2 5:2 97:2 | **o'mara** 10:21 | **oh** 78:23 93:3 94:3 |
| **mind** 96:2 | **name** 1:10,15 5:7,19 10:19 18:25 29:11 40:17 45:24 46:17 48:11 75:11 99:6,7 | **oath** 24:17 | **okay** 42:9 58:19 62:25 63:2 65:4 90:24 91:2 94:3 |
| **mineola** 3:15 5:25 99:4 | | **object** 84:6 | |
| | | **objection** 13:5,8 17:13 19:17,21 20:14 21:6 25:9 29:17 66:21 68:18 69:23 71:24 72:25 73:25 76:15 80:17 85:24 86:10 93:18 96:3 | **old** 80:4 99:4 |
| **minute** 39:9 | **names** 1:10,15 | | **once** 10:25 19:22 33:25 64:9 69:9,11 71:15 86:21 89:14 94:16 |
| **minutes** 38:22,25 39:5 | **narrative** 80:3 | | |
| **mobile** 84:24 85:10 85:16 | **nassau** 1:11,11,14 3:12,13,13 13:13,15 23:14 24:14 78:13 | | |
| | | | **opinion** 85:22 |
| **moment** 63:11 64:4 | **nature** 76:19 | **objections** 4:10 | **ops** 83:19 |
| **monique** 1:12,23 2:5 3:14 5:1,21 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1,18 99:7,20 | **nearby** 29:2 | **observe** 57:21 87:20 | **original** 49:23 50:5 50:7 |
| | **necessary** 67:11 | **observed** 57:24 64:9 86:19,19 96:9 | **outcome** 98:12 |
| | **need** 28:20 45:23 56:20 60:2 66:6 72:19,24 | **obviously** 54:12 95:8 | **outreach** 84:24 85:10,17 |
| | **needed** 22:10 33:14 33:14 48:23 73:13 95:20,22,23 | **occasion** 20:25 23:19 | **outside** 14:16 |
| | | **occurred** 9:12,16 33:17 81:20 | **overall** 63:16,17 |
| | **neglect** 21:9 | | **overhear** 88:17 |
| | **never** 45:4 79:20 85:14 90:7 93:14 | **occurrence** 62:4,7,8 | **p** |
| | **new** 1:2,19 2:10 3:4 3:10,15 5:4,25 15:5 15:8 28:7 98:5 99:2 99:4,4,4 | **office** 3:12 7:7,10 32:2 33:3 | **p** 3:2,2 98:4,18 |
| | | **officer** 1:11,12 3:14 3:14 5:7,21 7:8 8:9 8:11,15 9:5,18,21 9:25 10:8 14:7 15:14 16:2 19:3,6,6 19:15,18 20:5 23:14 24:14 27:4,15 28:2 29:15,24 31:2,7 40:20 42:7,8 43:17 43:20 45:7,16 46:6 47:10 48:16 53:11 53:15 54:19 58:7,14 59:19 61:15 65:3,8 71:16 72:3 73:6 74:16 75:22 77:19 79:4 85:13 88:9 | **p.c.** 3:3 |
| | | | **p.m.** 1:20 96:14 |
| | **normal** 15:17 17:11 | | **padolecchia** 19:3,5 |
| | **normally** 61:20 67:24,25 68:2 88:11 88:15 91:11 | | **page** 42:4 72:6,8 78:18 79:25 90:21 97:3,5,10 99:8 |
| | | | **pain** 81:4,7 |
| | **notary** 2:9 4:13 5:3 96:23 98:4 99:24 | | **paperwork** 60:13 89:5 91:15 |
| **month** 20:25 | **notations** 26:18,20 | | **paragraph** 42:4 |
| **months** 10:10 | **note** 84:5 | | **part** 7:14 26:3 96:9 |
| **morning** 41:22 | **notice** 7:14 70:4,19 | | **particular** 14:2 15:11 90:10 |
| **move** 43:7,8 | **number** 17:16 27:14 28:8 45:18,20 46:3 91:11 | | **parties** 4:6 98:11 |
| **moving** 43:6 | | | **partner** 8:17,18,19 8:22,25 16:3,5,14 18:23 19:2,16 20:5 42:25 57:12 95:23 |
| | **numbers** 94:7 | | |
| | **numerical** 50:14 | | |
| | **nurses** 88:16 | **officers** 14:5 16:21 69:21 70:3,12,18 | **parts** 43:6 |

[patient - references]

**patient**  79:10,15,19
  80:6,13,14 97:13
**patrol**  14:23 15:2,15
  15:18 31:4 87:9
**patrolled**  15:12
**pause**  42:13
**pd**  50:8 79:6
**pedigree**  87:25
**people**  34:3 49:5
  66:2 81:12 82:2
  88:24
**period**  39:9
**person**  32:7 34:11
  46:23 74:9 83:11
**personal**  47:21
  64:18
**personally**  96:9
**pertain**  26:9
**phone**  27:9,23,24
  28:2,3,3,4,5,8,15
  29:2,18,20 30:5,6
  30:12 48:4
**physically**  33:13
  58:25
**picking**  59:3 64:19
**place**  1:18 2:9 70:4
  70:6
**placed**  25:24 77:10
**plains**  3:10
**plaintiff**  1:4 2:6 3:3
**plaintiff's**  24:4
  60:19 79:12 84:3
  89:23 91:19 93:8
  97:9
**planned**  64:17
**please**  5:19 12:8
  19:4 79:8 84:5
  91:16
**point**  9:11 15:9
  34:13 42:10 48:15
  53:8 60:5 69:13,15
  75:25 92:25 94:25
  95:25
**police**  1:11,11,12
  3:13,13,14 5:21,24

7:22 8:8,11,14
  13:13,15 14:8,12,16
  15:14 16:21 23:14
  24:14 69:21 70:3,11
  70:18 76:9 77:13,19
  80:4 81:14 82:18,19
  82:21 95:13 97:14
**policy**  84:7
**poor**  38:12
**poorly**  64:22
**portion**  79:25
**possibility**  74:15
  85:12
**power**  73:16
**practice**  84:7
**precinct**  13:18,20
  14:3 52:5,8 91:11
  92:19,21,21,21
**precipitated**  64:24
**premises**  65:20
**prepare**  6:3,5,9,15
  6:22 8:2,6,12
**prepared**  79:22
**presence**  45:5,7,21
  45:23
**present**  5:22 32:25
  40:20,25 41:5,10,14
  41:18,19 42:20,23
  42:24 43:3,4 47:7
  47:11
**presently**  1:10,16
**pressure**  88:2
**pretty**  69:3
**previously**  11:4
**principal**  22:20 23:3
  27:10 32:12 47:19
  47:19
**principal's**  42:6
**printed**  61:23,25
**prior**  18:14,15,16
  20:4,6 21:11,11,24
  22:19 23:4 28:13
  29:22 32:10 33:20
  73:7 74:25 75:4
  83:8

**privilege**  7:12 12:6
**probably**  33:24 47:6
  60:15 76:22 88:2
**problem**  64:18
**procedure**  2:8 83:19
  83:25 97:14
**proceeded**  49:15
**proceeding**  53:3
**proceedings**  42:13
  96:15
**process**  11:20 88:22
  89:6
**processing**  61:10
**production**  7:11
  12:3
**promise**  94:22
**protest**  56:9
**protocol**  72:21
**provide**  97:6,7
**provided**  41:24
**psych**  88:5,5
**psychologist**  40:11
  41:24 42:22 48:12
  54:16 67:6 80:5
**public**  2:10 4:14 5:4
  96:23 98:4 99:24
**purpose**  65:14 93:15
**purposes**  21:4
**pursuant**  2:7 82:5
**put**  12:9 67:6,11
**puts**  93:20

**q**

**question**  4:10 5:13
  6:20 21:7 30:10
  62:4 70:15,16 74:3
  80:19 87:22 88:13
  94:4,15
**questions**  5:10 24:9
  70:20 84:6 94:20
**quoted**  59:20

**r**

**r**  3:2
**radio**  27:21

**rang**  56:16
**rank**  17:19
**raymond**  2:9 98:4
  98:18
**reaction**  74:22
**read**  38:17,20 42:2
  42:10
**reading**  42:14 62:24
**realize**  24:9
**really**  70:25
**reason**  49:19 59:10
  59:15 95:4 99:8
**reasons**  86:2
**recall**  7:19 22:5,16
  24:15 29:3,5,10,14
  30:24 31:16 32:18
  33:5 38:2 47:9,12
  53:5,7 56:2,3,5,6
  57:16,25 58:6 60:11
  61:17 63:9 69:15
  71:13 74:10,18,21
  75:24 77:15 78:8,11
  79:3,7 83:4 88:11
**receive**  81:12
**received**  17:8 27:9
  31:19 38:16 50:8
  58:22 81:14,17,24
  82:13
**receiving**  31:7
**recess**  42:17
**recirculate**  50:10
**recollect**  30:3 39:13
**recollection**  30:21
  32:15 36:23 37:12
  39:3 78:10 84:10
**record**  5:20 42:3
  48:7 98:8
**recounted**  39:12
**red**  53:6
**reevaluate**  66:6
**reference**  16:12
  21:14 26:25 51:7
  90:22 94:12
**references**  91:3

[referred - sir]

referred  11:4 44:15
referring  7:5 43:17
  46:6
refers  43:16 45:15
reflect  26:21
reflects  90:19
refresher  81:24
regard  39:25
regarding  76:18
regards  50:19 51:6
regular  53:4
reiterate  66:10
reiterated  43:23
  66:13
related  98:10
relied  68:22
rely  71:9,25
relying  67:17
remain  88:20
remember  28:21,25
  31:18,21 35:23 41:4
  41:9,13 43:20 46:9
  47:13 52:10 53:18
  57:17 58:4 63:24
  73:11 76:23 77:23
  81:18
removed  35:2,6,18
  59:2,5
rephrase  5:15 22:7
  27:20
report  7:15 17:7
  23:20 41:23 45:25
  46:9 47:2,4 51:14
  60:14,18 61:2,4
  66:17 67:12 78:17
  79:10,16,19 89:15
  89:21 97:12,13,15
reporter  24:4 60:19
  79:11 84:2 89:22
  91:19 93:8
reporting  99:2
represent  5:8
request  12:8 65:15
requested  9:14
  65:12 68:12,14 97:6

97:7
requests  97:5
required  26:6
reserved  4:11
residence  48:17
  51:22 53:9 55:9
  68:5 70:4,7 76:10
  77:5
resource  14:4,6 42:8
respective  4:6
respond  22:8 85:17
responded  32:2
  52:12 68:25
responsibilities  17:3
  17:7 26:4
responsibility  16:16
restrain  73:22
restrained  73:20
restrict  6:20
result  86:8,16,25
review  6:14,24 7:25
reviewed  6:21 11:10
  42:18
right  7:13 30:13
  38:23,24 39:10
  50:16,17 51:3,23
  56:12,13 60:9 62:2
  62:10 67:15 69:10
  71:16 78:3 81:22
  87:10
rmp  15:5
road  99:4
room  57:17,19 58:3
roosevelt  1:6,9,19
  3:8 14:5,13 15:13
  15:23 16:13,17,22
  16:25 18:2,5,9,19
  20:13 99:6
rose  20:20 21:2,5,13
  21:15 22:21 23:20
  26:10,14,23 27:2,8
  29:23 31:10 36:17
  38:14 39:19,20 40:8
  48:15 50:20 51:21
  55:7 58:23

route  50:13,18,25
  53:16
routinely  21:5
rpr  2:9
rules  2:7

**s**

s  3:2,11 5:2 16:21
  93:23,25
safely  53:10
saw  49:23 57:18
  62:22 63:3 69:17
  90:7 96:6
saying  29:5 36:5
  43:2,4,21 59:4
  80:22,23
says  38:21 39:6 42:5
  43:18 46:5 50:12,13
  50:23 51:2 61:19,20
  61:22 62:5 82:8
  89:7 92:8,9,16
scene  35:2 59:2,5
  65:13 86:5,14
school  1:6,9 3:8 14:4
  14:5,6,9,14,16
  15:13,20,24 16:13
  16:17,22,25 17:5
  18:2,5,9,19 20:21
  21:13 22:12,14
  26:10 28:20 31:22
  31:24 32:8 35:6,18
  36:20 38:7,10 40:10
  41:24 42:6,7,21
  46:13 48:11 49:14
  55:3,6 60:7 62:9,20
  65:5 66:2 67:5,18
  67:22 71:2,6 80:5
sealing  4:7
search  89:21 90:2,6
  90:9,11 97:15
second  42:15 90:21
  94:2
section  44:11,14
sector  15:11

security  89:3
see  26:17 36:10,14
  38:13,15 42:5 43:24
  49:18 56:23 63:6,13
  63:25 78:19 90:22
  92:8,24 93:23 94:8
  94:9,10
seen  25:15 60:22
  79:14,18,20 84:14
  90:3,9,13 93:13
sees  69:21
sent  13:2 54:4,7
  81:8
sequence  32:19 34:2
  37:4
sergeant  10:21,23
  11:12,14,22 12:4,14
  17:20 78:22
serious  86:8,17,25
served  15:23 18:4
  19:19
service  89:10,14,16
serving  18:8,18
set  98:7,14
sex  21:10
shaken  44:8
sheet  99:2
shield  17:16
shipped  44:24
shocked  53:23,25
short  42:13
shortly  27:3 29:3
show  24:7 41:21
  60:13 84:13 89:17
  89:25 91:22 93:11
sick  21:21
sign  63:20
signature  98:17
signed  4:13,14 89:8
signified  94:5
signifies  62:18
silverman  3:7
singling  64:19
sir  71:7

siren 52:20,21
sirens 52:23
sister 34:23 35:2
  36:18 48:2 54:8,24
  55:3 56:17,23 57:3
  59:3
sister's 34:21 45:11
  54:7 85:7
sitting 58:5
situation 22:9 38:5
  44:21 46:14 51:12
  72:22
six 18:13,14
sixty 80:4
smith 3:11 94:21,24
  96:12 97:4
sneakers 73:11
solo 76:8
somebody 25:12
  32:9 34:23 36:10
  43:9 44:22,23 60:2
  77:17,18
soon 69:17
sorek 3:16 6:17 7:13
  7:20 12:7,11 13:5,8
  17:13 19:17,21
  20:14 21:6 25:9
  29:17 41:12 50:2,6
  52:16,23 66:21 67:2
  68:9,18 69:23 70:14
  71:24 72:25 73:25
  76:15 80:17 82:16
  84:5 85:24 86:10
  90:16 93:18 96:4
sorry 12:10 13:7
source 49:3
spare 91:10
speak 6:8,11 8:5,11
  9:4,21 10:22 29:15
  29:24 31:2 32:11,20
  37:3,5 38:4 40:3,8
  40:14 42:25 43:7,8
  43:9 44:2 46:13
  48:9,12 56:24 65:22
  72:11 78:25 79:5

88:7,9
speaking 30:25
  40:22,23 55:13
speaks 88:12
specifically 41:4
  65:6 69:2 82:11
  84:6
specifics 38:2
spell 19:4,13
spend 14:19
spoke 10:7 30:4
  32:7,16,16,21,24
  33:6,24,25,25 34:3
  36:24 39:9,16,22,24
  40:10,16 46:24 47:5
  47:8,13 48:9 58:17
  64:22 65:10 88:14
spoken 8:14 9:17
  10:15 12:17 30:8
  34:23,23 36:18 48:2
sportsman 49:17
  50:14,19 51:3,22
sro 10:9 15:10 16:8
  16:10,12,24 17:6,25
  18:4,9,18 19:19
  20:13 45:19
sros 15:23 16:16,22
st 94:3
stairs 57:11
stalker 2:9 98:4,18
standing 58:5
start 18:8 69:14
  70:19
started 64:5,10 69:9
  69:11 71:16
stassi 1:11 3:14 8:9
  8:12,15 9:5,18,21
  10:2,8 16:2 19:7
  20:5 27:5,16 29:15
  29:24 31:2,7 40:20
  43:17,21 45:16 46:6
  47:11 48:16 53:11
  53:15 54:19 58:8,14
  59:19 61:15 65:3,8
  71:16 72:4 73:6

74:16 75:23 78:2,5
  79:4 85:13 88:9
stassi's 28:3 45:7
state 2:10 5:4,19
  46:9 55:4 86:22
  98:5
stated 43:12 63:25
statement 49:4
  63:14 80:9 81:6
states 1:2 45:14 80:2
  80:6
stating 80:4,13,14
stats 21:3
status 62:19
step 74:13
stipulated 4:5,9,12
stop 8:24
stopped 8:21 19:16
story 54:15
streaked 63:23
street 3:15
subscribed 96:19
  99:22
subsequent 9:15
substance 34:6
  44:17,19 95:3
succeed 19:6
sue 95:12
sufficient 66:3 67:22
suing 64:17
sum 34:6 44:17,19
  95:2
summarize 71:14
summary 78:17
super 72:20
supervisor 10:18,20
  17:19 72:15,18,23
  73:3
sure 35:13 47:3 48:5
  48:11 53:17,19
  57:11 82:9
susan 1:3 5:8
swinkin 40:12,13
  41:17,25 55:22 56:6

switched 87:16
sworn 4:15 5:3
  96:19 98:7 99:22
system 92:12,13

**t**

t 93:23,25
take 12:7 14:15
  25:14 42:15 51:25
  64:20 65:16 74:4
  75:6 76:20 89:2
taken 2:6 42:17
  47:23
talking 19:25 45:15
  64:5,10 65:12 69:10
  69:12 71:16
teacher 21:14,20
  33:11 40:16 46:18
team 84:24 85:10,17
technician 75:9
telephone 27:22
  45:18
tell 19:22 28:18,23
  33:16 34:8,22,25
  35:5,12 36:9,13,17
  43:10,13,15 47:25
  50:15 55:8,12 58:13
  58:16,17 66:7 68:15
  68:21 69:2 72:7
  73:5 75:16,19 95:2
  95:7,11
telling 44:13 75:4
temperature 88:2
term 92:8
terms 80:11
testified 5:5 12:22
  24:16 25:2 65:25
testimony 15:18
  29:23 31:14 32:6
  37:11 45:9 54:18
  59:16 65:24 66:3,12
  81:9 84:17 86:4
  98:6,9
thank 96:13

[things - work]

**things** 68:25 76:19
**think** 9:9,16 12:20
  12:25 13:10 25:3
  29:13 32:13 39:18
  53:2 57:10 66:19,23
  67:10 69:19 70:9,16
  70:21,23 71:3,14
  80:11,21 89:7 95:3
**thought** 6:10 68:12
**threat** 44:7,22 45:3
  48:25 58:24 59:25
  62:14 65:6 67:7,8
  67:15
**threaten** 49:8
**threatened** 33:12
  37:7 49:12,13 71:19
**three** 18:20 55:18,20
  55:21 81:18
**time** 2:8 4:11 5:13
  6:19,22 10:7 11:6
  12:13 13:23 14:10
  23:22 24:2 26:13,15
  26:18,20,22,25
  29:13,20 30:23 35:5
  35:9,16,24 37:18,22
  37:25 38:6,8,13,15
  39:15,18,20,23 40:4
  40:20 41:2 42:16
  43:3,5,10,14,14
  50:17,22 54:13
  55:15,17 58:8 60:7
  60:17 61:20,24 62:3
  62:7,9,13,13,14,15
  62:16,19 63:9 64:13
  66:5 68:3,13 74:8
  75:25 79:9 82:12
  83:15,24 85:6 86:12
  87:16 88:6 89:16,20
  91:17 93:6
**times** 9:4,7 10:22
  20:24 21:19 22:25
  23:7 24:21 38:3
  83:13
**today** 6:3,10,17,21
  18:2,15,16,23 24:17

25:5
**told** 30:22 37:21
  43:18,22 44:3 45:10
  45:12,13,16 46:7
  47:19 49:7 55:10,11
  55:14 58:20,23
  64:16 65:25 66:14
  67:18,22 74:19,25
  80:5 95:25 96:5
**top** 35:14 61:21
  83:20 84:16
**touch** 74:8
**tour** 17:11,22 23:16
  90:18,18,19
**traffic** 52:19 53:4
**training** 81:11,25
  82:7,23
**transcript** 98:8
**transferred** 30:17
**transmitted** 27:18
**transport** 84:18
**transported** 66:4,9
  67:23 68:6 73:7
  74:20 75:2,17 77:15
**triage** 87:14,18,24
  88:16
**triaged** 88:25 89:2
**trial** 4:11
**true** 1:10,15 98:8
**trying** 64:15
**turnpike** 3:4
**twenty** 38:22 39:4,9
  81:18,22 84:21
**two** 42:15 55:17
  69:21 70:3,11,18
  80:4 91:6
**type** 24:23
**typed** 61:6,7

**u**

**u** 5:2
**uh** 25:16
**un** 73:14
**unannounced** 70:12

**understand** 5:14
  7:24 30:10 74:3
  87:22
**understanding**
  37:17,20
**uneasy** 69:18,20
**uniform** 56:13,21
  70:18
**union** 1:6,9 3:8
  16:17,25 18:5,9,19
**unit** 93:7,12,16
  97:17
**united** 1:2
**units** 90:22
**university** 78:13
**unknown** 1:10,16
**upset** 47:22 63:7,10
  63:14,21,25 64:2,3
  69:14 70:3,11,17,24
  71:15 74:24,25 75:4
**upstairs** 57:10,13
**use** 27:15
**usually** 89:14 90:17
**utilized** 68:16

**v**

**v** 99:6
**verbatim** 28:18 65:9
**veritext** 99:2
**visible** 63:20
**visibly** 44:8
**visit** 26:10
**vitals** 76:20

**w**

**waited** 88:2
**waiting** 42:8
**waived** 4:8
**walk** 47:24
**walked** 64:8 73:14
  73:15 77:8
**walking** 59:7,11
**want** 23:9 41:21,25
  65:4 80:14,22 89:17
**wanted** 56:23 66:11
  69:3 73:10,12 80:6

**wants** 78:12
**ward** 88:5,5
**warrant** 89:4
**washington** 20:20
  21:2,5,13,15 22:21
  23:20 26:10,14,23
  27:2,8 29:23 31:10
  36:16 38:14 39:19
  39:20 40:8 48:15
  50:20 51:22 55:7
  58:23
**way** 44:9 55:4 61:18
  68:24 73:21 98:12
**weapons** 21:10
**went** 20:3,16 27:8
  32:19 33:8 51:22
  53:6 54:23 57:13
  62:19 67:7 75:19
  78:13 85:7 87:14,15
  87:17 89:9,16
**west** 3:15
**whatsoever** 82:14
**wheelchair** 33:14
  35:3,7 47:24 59:2,8
  59:10
**whereof** 98:14
**whichever** 34:2
**white** 3:10
**willingly** 73:9
**withheld** 7:11
**witness** 1:23 13:7
  46:16 66:25 71:5
  84:8,9,11,11 97:3
  98:6,9,14
**wolin** 3:3,3,5 5:6,7
  5:18 6:19 7:24 12:2
  12:10 23:24 25:11
  29:19 42:14 48:5
  50:4 60:16 79:8
  83:22 84:12 89:17
  91:16 93:5 94:19
  96:3,13 97:4
**words** 49:11 61:12
**work** 14:12 15:15
  15:19 17:23

[worked - york]

worked  72:9
working  14:20
  23:11,13,16
works  11:21 92:20
wortham  1:6 3:8
wreck  47:22
wrist  88:3
wristband  88:4
write  9:9 11:16,18
writing  11:9 12:9,12
  46:22 69:5 71:22
wrote  61:12 64:23

**x**

x  1:3,17 97:2

**y**

yeah  30:5 31:9
  35:19 39:17 47:3
  60:15 69:11 75:15
year  9:3 10:12 13:16
  80:4
years  8:20 13:22
  18:13,14,20 20:11
  81:19,22 84:21
yep  92:15
york  1:2,19 2:10 3:4
  3:10,15 5:4,25 98:5
  99:2,4,4,4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.