UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | |
| SUSAN McCARTHY, | : | 15-CV -1468(JFB)(SIL) |
| *Plaintiff,* | : | |
| | : | |
| -against- | : | |
| | : | |
| ROOSEVELT UNION FREE SCHOOL DISTRICT, | : | |
| DEBORAH L. WORTHAM, Individually and in her | : | |
| Official Capacity; CLYDE BRASWELL, Individually | : | |
| And in his Official Capacity; EDITH L. HIGGINS, | : | |
| Individually and in her Official Capacity; Roosevelt | : | |
| Union Free School District Employees JOHN DOE 1-10 | : | |
| (the name "John Doe" being fictitious, as the true | : | |
| names are presently unknown); COUNTY OF NASSAU | : | |
| COUNTY POLICE DEPARTMENT; POLICE OFFICER | : | |
| JOSEPH STASSI, Individually and in his Official | : | |
| Capacity; POLICE OFFICER MONIQUE AMODEO, | : | |
| Individually and in her Official Capacity; MEDIC | : | |
| MATTHEW FIELD, Individually and in his Official· | : | |
| Capacity; Nassau County Employees JOHN DOE 11-20 | : | |
| (the name "John Doe" being fictitious, as the true names | : | |
| are presently unknown), | : | |
| *Defendants.* | : | |
| | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

WOLIN & WOLIN
Attorneys at Law
420 Jericho Turnpike - Suite 215
Jericho, New York 11753
Telephone: (516) 938-1199
Facsimile: (516) 938-1178
E-Mail: wolinlaw@aol.com

# Table of Contents

Page

Table of Authorities ............................................................................................ ii

Preliminary Statement ........................................................................................ 1

Statement of Facts .............................................................................................. 2

Standard of Review ............................................................................................. 2

Argument

Point I      Plaintiff's Claims for False Arrest, False Imprisonment,
             Unlawful Search and Seizure and Violation of the New
             York State Mental Hygiene Law Should Not Be Dismissed      3

Point II     There is Evidence of a Conspiracy Between the County
             Defendants and the District Defendants                     10

Point III    Plaintiff's Due Process Rights Were Violated               14

Point IV     Plaintiff's Claim for Intentional Infliction of Emotional
             Distress Should Not Be Dismissed                           15

Point V      Plaintiff's Negligent Training Claim is Cognizable Under
             42 U.S.C. § 1983                                           16

Point VI     County Defendants Are Not Entitled to Qualified Immunity   18

Point VII    Plaintiff Can Establish Liability Under 42 U.S.C. § 1983   19

Conclusion .......................................................................................................... 20

# **Table of Authorities**

                                                                                    Page

Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)                               2, 13

Anderson v. Creighton, 483 U.S. 635, 639 (1987)                                     18

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)                           2

Bender v. City of New York, Docket 95-7402 (Second Circuit, March 1, 1996)          15, 16

Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988)                       3

Cronin v. AETNA Life Ins. Co., 46 F.3d 96, 202-203 (2d Cir. 1995)                   2

Chambers v. TRM Copy Centers Corp., 43 F.3d 36-37 (2d Cir. 1994)                    2

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)                              2

Daniels v. Williams, 474 U.S. 327, 331 (1986)                                       14

DeShaney v. Winnebago County Dept. of Civil Service, 489 U.S. 189, 196 (1989)       14

Donahue v. Windsor Locks Board of Fire Commissioners,
 834 F.2d 54, 57 (2d Cir. 1987)                                                     2, 3

Fischer v. Maloney, 43 NY2d 553, 557-58 (1978)                                      15

Gallo v. Prudential Residential Services Limited Partnership,
 22 F.3d 1219, 1224 (2d Cir. 1994)                                                  3

Glass v. Mayas, 984 F.2d 55 (2d Cir. 1993)                                          4, 19

Graham v. Connor, 490 U.S. 386, 395 n.10 (1968)                                     4

Harlow v. Fitzgerald, 457 U.S. 800 (1982)                                           18

Immediato v. Rye Neck School District, 73 F.3d 454, 460 (2d Cir. 1996)             14

Kaluczky v. City of White Plains, 57 F.3d 202, 2011 (2d Cir. 1995)                 14

Levine v. Gurney, 149 AD2d 473, 539 NYS2d 967, 968 (2d Dept. 1989)                 15

|  | Page |
|---|---|
| Moore v. Comesanas, 32 F.3d 670, 673 (2d Cir. 1994) | 5 |
| Morpurgo v. Inc. Village of Sag Harbor, 697 F.Supp.2d 309, 331 (EDNY 2010) | 11 |
| Murphy v. American Home Products Corp., 461 NYS2d 232, 236 (1983) | 15 |
| Murphy v. Murphy, 109 AD2d 965, 966, 486 NYS2d 457, 459 (3d Dept. 1985) | 15 |
| Salahuddin v. Coughlin, 781 F.2d 24, 27 (2d Cir. 1986) | 18 |
| Soldal v. Cook County, 506 U.S. 56 (1992) | 4 |
| T.S. Haulers Inc. v. Town of Riverhead, 190 F.Supp.2d 455, 461 (EDNY 2002) | 14 |
| United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) | 3 |
| Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992) | 16 |
| Webb v. Goord, 340 F.3d 105, 110-11 (2d Cir. 2003) | 11 |
| Weyand v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) | 4 |
| Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998) | 16 |

## **Preliminary Statement**

Plaintiff, Susan McCarthy, a teacher employed by the Roosevelt Union Free School District, commenced this action against the County of Nassau, the Nassau County Police Department, Police Officer Joseph Stassi, Police Officer Monique Amodeo and AMT Matthew Field (collectively the "County Defendants"). The County Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff opposes defendants' motion and submits that the Court should deny the motion in all respects.[1]

Plaintiff brings multiple separate causes of action against the County Defendants, all arising from their actions on May 28, 2014. The causes of action include both federal and state claims. They are Count V (False Arrest under 42 U.S.C. § 1983); Count VI (Procedural and Substantive Due Process under the Fifth and Fourteenth Amendments); Count VII (Due Process Liberty Interest under the Fifth and Fourteenth Amendments); Count IX (Unreasonable Search and Seizure under the Fourth, Fifth and Fourteenth Amendments); and Count X (Conspiracy under 42 U.S.C. § 1983).

Plaintiff interposes the following state claims under the doctrine of supplemental jurisdiction. Count XI (Assault), Count XII (False Imprisonment), Count XIII (Intentional Infliction of Emotional Distress), Count XIV (Negligent Hiring/Training/Supervision), Count XV (Violation of the Mental Hygiene Law), and Count XVI (Negligence and/or Gross Negligence).

The County Defendants claim that their actions "were appropriate and did not violate plaintiff's rights." Plaintiff disagrees and submits that the Court should deny the County

---

[1] The so-called "District Defendants" have also moved to dismiss in a separate motion for summary judgment.

Defendants' motion in all respects.

## Statement of Facts

Plaintiff respectfully refers the Court to the parties' respective Local Rule 56.1 Statements for a discussion of the relevant facts. Plaintiff specifically refers the Court to her additional allegations, beginning at paragraph 49 of her response to the County Defendants' Rule 56.1 Statement.

## Standard of Review

Courts have enunciated the standard for summary judgment many times. See, e.g., Cronin v. AETNA Life Ins. Co., 46 F.3d 96, 202-203 (2d Cir. 1995) and Chambers v. TRM Copy Centers Corp., 43 F.3d 36-37 (2d Cir. 1994). Under this standard, a motion for summary judgment may not be granted unless the court determines that there are no genuine issues of material fact to be tried and that the facts, as to which there is no such issue, warrant judgment for the moving party as a matter of law. *See, e.g.*, Fed.R.Civ.P. 56[c]; *see generally,* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, *see e.g.,* Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought, *see, e.g.,* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 57 (2d Cir. 1987). The inferences to be drawn from the underlying facts, revealed in materials such as affidavits, exhibits, interrogatory answers and depositions, must be viewed in the light most favorable to the party opposing the motion. *See,*

*e.g.,* United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).

On a motion for summary judgment, a court "cannot try issues of fact; it can only determine whether there are issues to be tried." Donohue v. Windsor Locks Board of Fire Commissioners, *supra.* at 58; *see also,* Gallo v. Prudential Residential Services Limited Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994). If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper. *See, e.g.,* Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988).

### Argument

### Point I

### Plaintiff's Claims for False Arrest, False Imprisonment, Unlawful Search and Seizure and Violation of the New York State Mental Hygiene Law Should Not Be Dismissed

The record herein reveals that there are issues of fact with respect to plaintiff's claims for False Arrest, False Imprisonment, Unlawful Search and Seizure and Violation of the New York State Mental Hygiene Law. There are real issues of fact as to whether the County Defendants had a reasonable or well-founded belief that plaintiff appeared to be mentally ill **and** was conducting herself in a manner which was likely to result in serious harm to herself or others. Similarly, there are real issues of fact as to the sufficient nature of the investigation that the County Defendants conducted to establish such belief.

The elements that plaintiff must show are that (1) the defendants intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged or justified.

-3-

Weyand v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).

At the outset, the County Defendants are wrong in asserting that there was no arrest and confinement as contemplated by the Fourth Amendment. Plaintiff was "seized" within the meaning of the Fourth Amendment. Glass v. Mayas, 984 F.2d 55 (2d Cir. 1993).

The Supreme Court has stated "a 'seizure' triggering the Fourth Amendment protections occurs when government actions have 'by means of physical force or show of authority ... in some way restrained the liberty of a citizen.'" Graham v. Connor, 490 U.S. 386, 395 n.10 (1968). Here, the police officers took plaintiff to the hospital against her will and she was involuntarily confined there for a period of several hours. This infringement of her liberty was tantamount to being arrested. Glass v. Mayas, supra. That plaintiff's seizure occurred in the civil context does not render the Fourth Amendment inapplicable. Soldal v. Cook County, 506 U.S. 56 (1992).

That being said, we must then determine if the County Defendants' actions were based upon a reasonable or well-founded belief that plaintiff appeared to be mentally ill **and** was conducting herself in a manner which was likely to result in serious harm to herself or others.

In fact, OPS 11-55, which the County Defendants have stated to be the relevant Department Procedure, states that its purpose is "To establish procedures for assisting mentally disabled persons." The definitions of which are:

"Likely to result in serious harm:

1. A substantial risk of physical harm to himself as manifested by threats of, or attempts at, suicide or serious bodily harm, or other conduct demonstrating that he is dangerous to himself, or

-4-

Note: Other conduct may include the person's refusal or inability to meet his essential need for food, shelter, clothing, or health care.

2.    A substantial risk of physical harm to other persons as manifested by homicidal or other violate behavior by which others are placed in reasonable fear of serious physical harm.

Note: **The Mental Hygiene Law (MHL) §9.41 authorizes a Police Officer to take into custody any person who appears to be mentally ill and is conducting himself in the above described manner.  The custody is for transportation to a hospital for psychiatric evaluation**. (emphasis added)

There are issues of fact as to whether the County officers reasonably believed that plaintiff was mentally ill **and** was conducting herself in the manner described.

The question of whether the County officers had probable cause, based upon this record, "[is] predominantly factual in nature."  As a result, it is an issue properly presented to a jury.  Moore v. Comesanas, 32 F.3d 670, 673 (2d Cir. 1994).

The record is replete with factual assertions which call into question the County officers' actions.  They either did not have the requisite degree of cause or, in the alternative, did not conduct an adequate investigation under which they would have discovered the true facts.  Either way, there are sufficient factual issues to warrant the denial of the County Defendants' motion.

Some of the evidence of record establishing disputed issues will be discussed.

Defendant Higgins asked plaintiff if she was going to "hurt herself." (District 50-h Tr. 52:21-25; County 50-h Tr. 35:19-21)  Plaintiff emphatically said "of course, not" that she "would never think of doing that."  (County 50-h Tr. 36:2)  At no time did plaintiff make any

statement that she was thinking of hurting or killing herself. (District 50-h Tr. 53:8-12; County 50-h Tr. 36:3-6) Plaintiff, after saying that she would never hurt herself, even mentioned that she had a family that she loved and would never do anything to hurt them. (McCarthy Tr. 47:22-25)

Plaintiff, not only indicated to those present in the Nurse's office that she would never think of hurting herself, but she also wrote as such in her contemporaneous journal. (McCarthy Tr. 47:22-25; District Defendants' Exhibit G; County Defendants' Exhibit N)

At some point, plaintiff mentioned her previous joke that she had uttered when Dr. Wright, the previous Principal, was Principal. That had occurred a long time in the past. At that time, plaintiff had a difficult class. She told Dr. Wright that, if Dr. Wright did not help, she was going to jump out the window. The joke was that plaintiff was on the ground floor. Everyone knew that this was a joke and not to be taken seriously. (McCarthy Tr. 47:17-21) In fact, everyone laughed. (McCarthy Tr. Tr. 51:20-25)

Plaintiff, while in the Nurse's Office, never stated that her headache was so bad, that it felt like she was "dying" or that she "would rather die." (McCarthy Tr. 94:4-8)

Defendant Higgins claims that plaintiff casually said "Oh, I just want to kill myself." After someone said "No, you don't mean that." Plaintiff responded "Yeah, I guess not, because then my family and friends would be upset." (Higgins Tr. 87:14-21)

At other times, defendant Higgins stated that plaintiff said "I just feel like killing myself." (Higgins Tr. 118:19-20, 133:12-13, 134:4-5)

According to defendant Higgins, plaintiff "wasn't as upset as she was when I initially came on the scene. She was calmer and less emotional." (Higgins Tr. 97:13-19)

Ms. Swinkin, the School Psychologist, in her statement (District Defendants' Exhibit I), stated "Ms. McCarthy shared with us that years ago she was going through a similar experience and Dr. Wright, who was then the school principal, used to joke with her that 'even if she wanted to kill herself, the windows in her classroom aren't high enough to jump out.' [Her classroom is located on the ground floor.] Ms. McCarthy stated that presently there are days when she feels similar." Ms. Swinkin also stated that she and defendant Higgins asked the other teachers to leave and plaintiff started to calm down.

Plaintiff told defendant Higgins that she wanted to go home and relax. (District 50-h Tr. 44:4-45:5; County 50-h Tr. 37:8-9) Defendant Higgins said "Ok." Defendant Higgins suggested that plaintiff go to her sister's house, who lived close by. Plaintiff's sister was contacted and arrived within minutes. (County 50-h Tr. 34:23-25) She told those present "Don't worry, I will take good care of her. I will take her home and put her to bed." (County 50-h Tr. 41:2-5) Plaintiff left the school grounds.

Plaintiff went to her sister's house located at 233 Sportsmans Avenue, Freeport, New York. (District 50-h Tr. 45:14-15; County 50-h Tr. 42:5-6) Plaintiff arrived at her sister's home at approximately 9:30-9:45 a.m.. (County 50-h Tr. 43:6-7) After arriving at her sister's house, plaintiff went into bed for approximately an hour. She then went into the jacuzzi. She then ate a meal. (County 50-h Tr. 44:10-22) Plaintiff continued to have a migraine headache but eventually was starting to feel better. (District 50-h Tr. 45:23-25; County 50-h Tr. 44:10-22)

Ms. Swinkin, together with Ms. Chester, the School Nurse, and Ms. Emmanuel, the School Social Worker, called plaintiff to check on her. Plaintiff's sister confirmed that plaintiff was now relaxed and doing well. (Higgins Tr. 106:10-24; District Defendants' Exhibit I)

Moreover, Ms. Beno called and spoke to plaintiff.  Ms. Beno told defendant Higgins that plaintiff was with her sister "and that she was fine, she was doing, you know, doing much better." (Higgins Tr. 104:25-105:19)

Much of these facts were relayed to defendants Stassi and Amodeo.  Defendant Higgins told defendants Amodeo and Stassi that she did not feel that there was anything dangerous or threatening.  She did not take anything that plaintiff said as dangerous or a threat or anything. (Higgins Tr. 124:19-125:2, 127:19-128:10)

As defendant Higgins was attempting to tell this to defendants Amodeo and Stassi, defendant Stassi kept yelling.  Defendant Higgins said "She is home with her sister and she is okay."  Defendant Higgins referenced the fact of Ms. Beno's telephone call. (Higgins Tr. 125:5-13)

Defendants Amodeo and Stassi asked to speak to Ms. Beno.  Defendant Braswell summoned her and she spoke to them.  Ms. Beno told defendants Amodeo and Stassi that plaintiff was okay and that she was at her sister's house.  Defendant Amodeo and Stassi then asked Ms. Beno for plaintiff's sister's name and address, which she gave them. (Higgins Tr. 126:15-127:4)

Defendants Amodeo and Stassi also spoke to Ms. Swinkin, who had spoken to plaintiff's sister, and were told that plaintiff was relaxed and doing well.  (Higgins Tr. 126:18-20) Defendant Stassi, according to Ms. Swinkin's statement, threatened her and stated she "should be aware of the consequences of [her] actions and that he is going to report [her] to the State." (District Defendants' Exhibit I) Defendant Stassi even snatched Ms. Swinkin's badge. (Braswell Tr. 50:5-23)

Defendants Amodeo and Stassi then left the school to go plaintiff's sister's house. (Higgins Tr. 129:10-13; Amodeo Tr. 48:14-49:2) Prior to leaving the school, defendants Amodeo and Stassi made no effort to contact plaintiff. (Stassi Tr. 45:23-26) Defendants Braswell and Higgins knew that the officers were going to visit plaintiff.  Neither protested. (Amodeo Tr. 55:7-56:11)

It appears that defendants Amodeo and Stassi were intent on ignoring everything that they were told.  To the extent they were not informed, they should have elicited the real facts through an appropriate investigation.  Moreover, no one told the officers that plaintiff was "mentally ill" and they had no reason to believe that plaintiff was mentally ill.

In the patrol car, on the way to plaintiff's sister's residence, defendants Amodeo and Stassi stated they were "shocked" that plaintiff was allowed to leave under the Mental Hygiene Law.  They stated to each other that plaintiff should have been sent for an evaluation. (Amodeo Tr. 53:14-54:10)

The officer's demeanor, as reflected by their interactions with defendant Higgins and Ms. Swinkin and as referenced in their communications en route to visit plaintiff, is relevant as well.  It reveals that, to a large extent, the officers had already prejudged the matter.

When defendants Amodeo and Stassi arrived and first saw plaintiff, plaintiff was calm. (Amodeo Tr. 63:3-7)  She only became excited once they started talking to her. (Amodeo Tr. 64:8-11) At that time, plaintiff's demeanor changed. (Amodeo Tr. 69:8-22)

Upon being told that she had to involuntarily go into an ambulance and be taken to a psychiatric unit, plaintiff, again, became upset.  (County 50-h Tr. 48:12-16)  She noted that defendant Higgins had told her that she could go to her sister's house. (County 50-h Tr. 48:7-

11)

In response to a question by Officer Stassi, plaintiff stated:

> "I said to him, aren't you supposed to be able to assess a situation, if you come into a situation, you can see clearly I am not a threat to myself, this is when they were telling me I had to go.
>
> I said you are going to take me against my will, clearly I have a migraine, I am here with my sister.  He said things happen in other places where people are not what they seem.
>
> I said I am telling you there is nothing wrong with me and that is when he said we have to take you to the psychiatric unit.  I said this is really getting crazy." (McCarthy Tr. 106:16-107:3)

During the time that plaintiff was at NUMC and not free to leave, she was told by an unidentified nurse that there was no reason why she was there in the first place. This nurse stated that it was not appropriate that she was there and that she was sorry that someone would do something so vicious as to put her through this. (District 50-h Tr. 48:10-15)

After waiting several hours, plaintiff was evaluated by two (2) psychiatrists who opined that plaintiff was at low risk for self-harm or for harm to others and that there was nothing wrong with her. (County 50-h Tr. 54:12-16)  One of the psychiatrists told plaintiff that she should pursue the matter from a legal perspective.  (District 50-h Tr. 48:22-25)  The psychiatrists appeared to be annoyed and upset. (County 50-h Tr. 60:22-61:2)

The psychiatrists did not understand why no one had examined plaintiff as a result of her chest pain or migraine pain.  They could also not understand why plaintiff was sent to the psychiatric unit in the first place. (County 50-h Tr. 60:8-14) They further told plaintiff that the whole situation was not conducted in a proper way. (County 50-h Tr. 60:13-14) This conversation is also confirmed in plaintiff's contemporaneous notes.  Plaintiff wrote "When

I finally got to the doctor, she said she was sorry I had to go through this for nothing, clearly someone was using this as punishment." (McCarthy Tr. 59:1-6)

As a result of all of the foregoing, there are issues of fact as to whether the County officers had sufficient cause to believe that plaintiff was mentally ill and was conducting herself in such a manner which was likely to result in serious harm to herself or others and whether their investigation was sufficient.  As such, the relevant counts of the complaint must not be dismissed.

## Point II

### There is Evidence of a Conspiracy Between the County Defendants and the District Defendants

There is sufficient evidence in the record to establish issues of fact as to whether the District Defendants and the County Defendants acted in a willful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights … secured by the constitution or the federal courts." Morpurgo v. Inc. Village of Sag Harbor, 697 F.Supp.2d 309, 331 (EDNY 2010).  A tacit agreement can suffice under 42 U.S.C. § 1985(3), Webb v. Goord, 340 F.3d 105, 110-11 (2d Cir. 2003).

Here, there is sufficient evidence that, at least, a tacit agreement existed between the District and the County.  Based upon the interaction between the District employees and the County officers, the District Defendants had every reason to believe that seeking police intervention would ultimately lead to plaintiff being transported to the hospital.

After plaintiff departed the school, defendant Braswell instructed defendant Higgins to inform the police of what happened. (Braswell Tr. 60:23-61:3) At the time, defendant Braswell did not know if plaintiff was still in the school.  (Braswell 64:19-65:3)

Defendant Higgins placed the call and two Nassau County Police Officers, who serve as the School Resource Officers (SRO) for the School District, arrived.  They were defendants Amodeo and Stassi. (Higgins Tr. 109:22-110:4) Defendant Amodeo received the call from defendant Higgins at 1:37 p.m.. (Amodeo Tr. 26:22-23, 27:7-13)

The SROs are Nassau County Police Officers who are assigned to the School District. (Higgins 113:10-15) They both had a close working relationship with the District.  Defendant Amodeo had been an SRO in the School District for several years prior to May 2014.  (Amodeo Tr. 18:8-22) She had met both defendants Braswell and Higgins multiple times. (Amodeo Tr. 22:19-23:2, 23:3-8)

Defendant Higgins called defendant Amodeo's cell phone.  Defendant Higgins did not place the call through 911.  (Amodeo Tr. 27:14-25) Defendant Higgins had never before called the telephone number that she used to reach the officers. (Higgins Tr. 115:10-112)  To defendant Higgins' knowledge, this was the only time that SROs had come to the school with reference to the conduct of a teacher. (Higgins Tr. 149:16-21)  Defendant Higgins told defendant Amodeo, who answered the phone, what had taken place and that a teacher was very upset. (Higgins Tr. 117:18-19)

Defendant Braswell had instructed defendant Higgins to contact the police after 12:00 p.m., several hours after plaintiff had departed the school.  By then, defendant Higgins had already spoken to Ms. Swinkin and Ms. Beno about their telephone calls to plaintiff and her sister.  (Higgins Tr. 110:5-13)

After receiving defendant Higgins' call, defendants Amodeo and Stassi soon arrived at the school.  (Higgins Tr. 120:14-16) Defendants Amodeo and Stassi were in the full uniform

of a Nassau County Police Officer. (Higgins Tr. 121:15-17)  Defendants Amodeo and Stassi went to defendant Braswell's office.  Defendant Higgins was called into the office by defendant Braswell.  (Higgins Tr. 122:14-21, 123:16-17)  Defendant Stassi was very upset, angry and yelled "Why was she allowed to go home?"  He harped on that over and over.  (Higgins Tr. 124:12-18)  Defendant Stassi began to talk about how dangerous it was to permit plaintiff to go home. (Higgins Tr. 124:12-18)  Defendant Stassi said he was concerned about the District's liability. (Braswell Tr. 51:21-52:6, 59:7-12)

Defendants Amodeo and Stassi then left the school to go plaintiff's sister's house. (Higgins Tr. 129:10-13; Amodeo Tr. 48:14-49:2) Prior to leaving the school, defendants Amodeo and Stassi made no effort to contact plaintiff. (Stassi Tr. 45:23-26) Defendants Braswell and Higgins knew that the officers were going to visit plaintiff.  Neither protested. (Amodeo Tr. 55:7-56:11)

The fact that the District Defendants did not protest is significant.  Although defendant Higgins claimed that she did not know why defendant Braswell directed her to contact the police, the point is that the District Defendants were willing participants in the chain of events that led to plaintiff being involuntarily taken to the hospital.  The District Defendants compounded their willing participation when they themselves questioned plaintiff's mental fitness by sending her to the Section 913 examination.  It must also be remembered that defendants Stassi and Amodeo had a close working relationship with the District.

Conspiracy can rarely be proven by direct evidence of agreement.  Rather, it largely depends on the circumstances present.  A tacit agreement or a policy of acquiescence by the District may be sufficient.  Defendants may be liable under § 1985(3) for conspiracy to violate

a constitutional right, even though some did not directly commit the underlying violation. This is a matter of fact which must be determined at trial. <u>Adickes v. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

<b>Point III</b>

<b><u>Plaintiff's Due Process Rights Were Violated</u></b>

Contrary to defendants' argument, plaintiff has demonstrated a substantive due process claim. Substantive due process protects against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense. <u>Kaluczky v. City of White Plains</u>, 57 F.3d 202, 2011 (2d Cir. 1995). Substantive due process protects against arbitrary government actions regardless of the fairness of the procedure used to implement them. <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986) and <u>Immediato v. Rye Neck School District</u>, 73 F.3d 454, 460 (2d Cir. 1996). This right ensures that government officials will be prevented from "abusing its power or employing it as an instrument of oppression." <u>DeShaney v. Winnebago County Dept. of Civil Service</u>, 489 U.S. 189, 196 (1989). In addition, plaintiff must have a valid property interest. <u>T.S. Haulers Inc. v. Town of Riverhead</u>, 190 F.Supp.2d 455, 461 (EDNY 2002).

Plaintiff has, in a detailed fashion in her Rule 56.1 Statement, identified the constitutional rights at issue herein and that the actions of the police officers were arbitrary and improper. Under the facts presented herein, plaintiff has sufficiently established a claim under substantive due process.

**Point IV**

**Plaintiff's Claim for Intentional Infliction of
Emotional Distress Should Not Be Dismissed**

Contrary to the County Defendants' argument, plaintiff states a claim for intentional infliction of emotional distress. In order to prove a claim for intentional infliction of emotional distress, plaintiff must allege extreme and outrageous conduct which intentionally or recklessly causes severe emotional distress. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Murphy v. American Home Products Corp., 461 NYS2d 232, 236 (1983). Plaintiff asserts that the conduct enumerated in her Rule 56.1 Statement falls within the definition of intentional infliction of emotional distress.

Moreover, plaintiff asserts that a claim for intentional infliction of emotional distress is not duplicative of the tort claim of false imprisonment and assault. *See*, Bender v. City of New York, Docket 95-7402 (Second Circuit, March 1, 1996).

The State Court of Appeals' decision in Fischer v. Maloney, 43 NY2d 553, 557-58 (1978) was not unequivocal. The court held "[I]t may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability, here malicious prosecution and abuse of process." Id. at 557-8. In fact, several state courts have not followed Fischer. *See*, Levine v. Gurney, 149 AD2d 473, 539 NYS2d 967, 968 (2d Dept. 1989) (claims for emotional distress and malicious prosecution) and Murphy v. Murphy, 109 AD2d 965, 966, 486 NYS2d 457, 459 (3d Dept. 1985) (emotional distress claim encompassing conduct

-15-

constituting assault and battery).

The Court's attention is also directed to the Second Circuit's decision in <u>Bender</u>, <u>supra</u>. There, the court let stand the lower court's conclusion that the emotional distress claim did not "overlap" with a false arrest, battery and malicious prosecution claim. The lower court had found that the elements between the torts did not necessarily overlap.

This claim should survive.

**Point V**

**Plaintiff's Negligent Training Claim is Cognizable Under 42 U.S.C. § 1983**

Plaintiff's claim of negligent training against the County Defendants is cognizable under 42 U.S.C. § 1983. Liability may be inferred "where a municipal's failure to train amounted to 'deliberate indifference' of the right of citizens." Liability may be inferred where "(1) ... 'a policy [of the municipality] knows "to a moral certainty" that [its] employees will confront a given situation; (2) 'the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult; and (3) the wrong choice by the ... employee will frequently cause the depriving of a citizen's constitutional rights.'" <u>Young v. County of Fulton</u>, 160 F.3d 899, 903 (2d Cir. 1998) quoting <u>Walker v. City of New York</u>, 974 F.2d 293, 297-98 (2d Cir. 1992).

In the case at bar, questions of fact exist with reference to the inference of liability. As we have seen, the County, through its police department, has implemented a policy or procedure, OPS 11-55, which directly governs the events of May 28, 2014. By implementing this policy and procedure, the County knew to a certainty that its police officers would confront a similar situation. There also can be no question from the record that the defendant

officers were presented with a difficult choice that could have been made less difficult with appropriate training and that the wrong choice by the officers could result in a deprivation of rights.

The record, in fact, confirms the paucity of training that the officers received. The only training that defendant Amodeo received in dealing with mental hygiene matters was in the police academy some twenty-three (23) years prior. She did not receive any refresher training. (Plaintiff Rule 56.1 ¶ 142) Likewise, defendant Stassi did not have any training in mental hygiene matters after he left the police academy in 2004. (Plaintiff Rule 56.1 ¶ 143) Defendant Amodeo was not even familiar with OPS 11-55. In fact, she had not seen it before. (Plaintiff Rule 56.1 ¶ 144)

The officers' ignorance was also reflected by the fact that they did not consider calling the Mobile Crisis Outreach Team (MCOT), who would have responded, as provided for in OPS 11-55. The Mobile Crisis Outreach Team would have been entirely appropriate herein. OPS 11-55 provides as follows:

> **Mobile Crisis Outreach Team (MCOT)**: a group consisting of physicians and/or Qualified Mental Health Professionals who will respond to any location within Nassau County to make assessments of individuals who appear to be having psychiatric problems. The MCOT operates out of the Nassau University Medical Center (NUMC).
>
> **Note**: **Police Officers should make referrals to the MCOT when they encounter a person who may need evaluation, but does not meet the MHL standards for an emergency hospital admission**. (emphasis added)

Such a referral was more appropriate than the conclusion that the officers reached.

Based upon the foregoing, the County may be liable for negligent training and

supervision and that such a claim does not fail as a matter of law.

**Point VI**

**County Defendants Are Not Entitled to Qualified Immunity**

The County Defendants are not entitled to qualified immunity.  In <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), the Supreme Court held that qualified immunity shields a governmental official from liability if the official's conduct did not "violate clearly established or constitutional rights of which a reasonable person would have known."  In <u>Salahuddin v. Coughlin</u>, 781 F.2d 24, 27 (2d Cir. 1986), the court held that "Officers are held to have constructive knowledge of established law."

Furthermore, the Supreme Court held in <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987) that "whether an official protected by qualified immunity may be held personally liable for an alleged unlawful official action generally turns on the 'objective reasonableness of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken."

The court in <u>Harlow</u> noted that the availability of qualified immunity was limited:

> "By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct.  The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts.  Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action."  <u>Id</u>. at 819.

In the case at bar, there is no question that the defendant officers' conduct violated clearly established law.  Defendant officers' conduct violated clearly established law of which

a reasonable person in their stead would be expected to know is clear.  The defendant officers testified that they had done many similar visits in the past. The parameters under which they could act are clearly set forth in the Mental Hygiene Law and in the County's own policy and procedure.  *See*, Glass v. Mayas, supra. ("At the time that plaintiff was involuntarily hospitalized, it was clearly established that an allegedly mentally ill individual could not be confined unless that individual was found to pose a danger to herself or others.")

We shall then have to discuss whether the officers' actions were objectively reasonable. Based on the previous discussion in Points I and V, supra., plaintiff asserts that there are multiple issues of fact as to whether the officers acted reasonably in light of the information they had or should have had if they conducted an appropriate investigation.

Qualified immunity does not shield the County Defendants from liability herein.

### Point VII

### Plaintiff Can Establish Liability Under 42 U.S.C. § 1983

Plaintiff refers the Court to her discussion with reference to Point V to support her claim that the County is liable herein.

## <u>Conclusion</u>

For all of the foregoing reasons, plaintiff respectfully submits that the County Defendants' motion for summary judgment should be denied in all respects.

Dated: Jericho, New York
       January 17, 2017

WOLIN & WOLIN

*Alan E. Wolin*

By: Alan E. Wolin, Esq.
*Attorney for Plaintiff*
420 Jericho Turnpike, Suite 215
Jericho, New York 11753
Tel.: (516) 938-1199
Fax: (516) 938-1178
Email: wolinlaw@aol.com
